# American Fidelity and Casualty Company, Inc., v. White Motor Lines, Inc.

*J. J. McDevitt*, for plaintiff.

*Glenn A. Troutman* and *W. Glenn George*, for defendant.

Bok, P. J., January 29, 1954.—Despite the welter of argument, the fact remains that plaintiff insurance company paid a claim that was outside the coverage of its policy because the Interstate Commerce Commission endorsement required it, in protection of the public, to pay for accidents on defendant's specified route "or elsewhere". The specified route was between Norfolk and New York, and the accident happened on the Pennsylvania Turnpike, far west of it.

Defendant's action in sending the truck off the contract route made plaintiff liable to pay under the ICC requirements, and its argument that plaintiff was a volunteer breaks against this fact. The truck was defendant's under a lease from its owner whose terms specifically made the truck defendant's for the trip. This fact sharply distinguishes the case from the authorities cited by defendant, since this truck was admittedly covered by the policy.

Plaintiff, after concluding a nonwaiver agreement, sued its insured for the payment it made to settle the claims arising from the accident, and recovered a verdict of $10,515.54. Defendant seeks a new trial or judgment n. o. v.

The basic facts are not in dispute.

The insured route does not appear in the policy offered in evidence as exhibit P. 5, but it does appear in the endorsement to declaration 5 of the policy attached to the complaint as exhibit A. It appears to be agreed that the endorsement was in fact part of the policy contract. The route is described as:

"Transportation of merchandise for compensation over route from Norfolk, Virginia, to New York, New York."

A relatively narrow corridor between these two points is set out in defendant's Certificate of Public Convenience, Exhibit D. 1.

Another endorsement to the policy for coverage

under section 215 of the Interstate Commerce Act has three pertinent provisions:

1. "The Company hereby agrees to pay any final judgment recovered against the insured. . . ."

2. "The liability of the Company extends to such losses, damages, injuries, or deaths whether occurring on the route or in the territory authorized to be served by the insured or elsewhere. . . ."

3. "The insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement."

The policy provides in II(a) :

"The Company shall (a) defend in his (the insured's) name and behalf any suit against the insured . . . but the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company."

As a result of the accident suits were begun in Pittsburgh and plaintiff appeared by counsel, who after negotiation settled them in court before trial. Verdicts were taken for plaintiffs, judgment was entered on them, and plaintiff paid them. There is no merit in defendant's contention that there is a variance in that plaintiff alleged "verdicts" and proved "settlements". Its point is that only hostile judgments count, but the policy refers to "any final judgment". Since there were final judgments, it makes no difference whether they were adverse or by agreement.

The accident happened, according to defendant's contention, within the certificated route of the Cumberland Motor Express Company. Defendant's truck was not its property but was owned by C. B. Hitchens.

The lease covering this equipment is exhibit P. 1 and is dated September 12, 1947. It contains these provisions:

"And the said party of the second part (defendant) hereby agrees that during the term of this lease the party of the second part shall be liable for any damage or injury to any person or any property the same as it would be if it owned such equipment.

"And during the term of this lease any person driving . . . such equipment shall be deemed to be an employee of the party of the second part who shall thereby bear to such person . . . the relation of master and servant. . . ."

The driver was Roy Edwards, who signed the lease for Hitchens. Edwards testified that he got his instructions to take a load to Pittsburgh from Joyce, defendant's dispatcher, but he also testified that he was not told which route to follow. He therefore selected his own.

Joyce testified that he prepared the lease and put in "Cumberland Motor Express" because he had been told to do so in all such leases by Mr. Campbell, defendant's vice president. He had no such instructions from anyone connected with Cumberland Motor Express.

Tysor, defendant's president, testified that he instructed Joyce to route all hauls to Baltimore, which was on defendant's certificated route from Norfolk to New York. Baltimore was the exchange point with Cumberland Motor Express, whose certificated route included Baltimore to Pittsburgh. Tysor said: "We negotiated with the carrier (Cumberland) who had operating authority at a common point of our authority to run into Pittsburgh."

These "negotiations" are wholly vague so far as this particular shipment is concerned. It is not even clear

that they covered it. There was indeed a joint haul tariff covering both carriers, together with Cumberland's certificate of public convenience (exhibit D. 2 and D. 3), but neither shows on its face that it was valid at the time of the accident. The same is true of defendant's certificate of public convenience, exhibit D. 1, which became effective April 13, 1944. D. 2 became effective on July 2, 1947; D. 3 on December 31, 1942. The accident occurred on September 13, 1947. Counsel appear to agree that D. 1, D. 2, and D. 3 were in effect on September 13th, and hence we assume that they were.

In any event, Cumberland Motor Express is not a party to the lease. Its mere name on the paper, unattested by any officer or agent, means nothing. The only hint of authority to put it there, even to identify the route to be taken, is in Tysor's vague "negotiations". The truck, however, did not even take the route, indicated by the presence of Cumberland's name, from Norfolk to Baltimore to Pittsburgh, but took a shorter route of the driver's devising that eliminated Baltimore. The accident did not happen on the part of the route outside of both defendant's and Cumberland's territory, but just beyond the point where the truck rejoined Cumberland's route. This cannot save the diversion from being a breach of the policy, for if the truck had taken the longer track through Baltimore, the accident might not have happened. We cannot therefore regard the diversionary route between Norfolk and the Breezewood Interchange on the turnpike as irrelevant. Joyce disobeyed his instructions as to routing, and the resulting diversion and accident became defendant's direct responsibility. Its breach of the insurance contract is clear, as is the reason for the ICC endorsement in protecting the public against just such diversions.

There is even a grave question whether the truck was technically on Cumberland's certificated route, although it was physically on a portion of it when the accident occurred. This is granting, arguendo, that the unattested name of Cumberland Motor Express on the lease or even on the bills of lading had any effect whatever. If Tysor's "negotiations" mean anything, it is that the route should be from Norfolk to Baltimore to Pittsburgh. The route actually taken by Edwards was: Route 60 from Norfolk to Richmond; Route 1 from Richmond to Fredericksburg; Route 17 from Fredericksburg to Winchester; and Routes 22 and 126 from Winchester to the Breezewood Interchange. None of these route numbers or places appears in exhibit D. 3, which is Cumberland's certificate of public convenience and which specifies the routes to be taken from place to place. The route from Baltimore to Pittsburgh, however, is included. The situation is not changed by the joint haul tariff, exhibit D. 2, which covers hauls from points in Virginia to Pennsylvania, among others, and more specifically from Camp Peary (Norfolk), Va., to Pittsburgh, Pa. This tariff is limited as follows: "Applicable only for joint hauls via White Motor Lines, Inc., in connection with the Cumberland Motor Express Corporation." The evidence is clear that the only connecting point on the routes of these companies was Baltimore.

Any substantial diversion from the specified route should render responsibility for the whole route nugatory. There is no scrap of evidence that Cumberland knew of the diversion or approved it, and a variety of traffic and business reasons could justify the designation of one particular route rather than another. If insurance responsibility ceases when a car is used on personal use under a policy specifying commercial use, as in Hoar v. Gray et al., 352 Pa. 373 (1945),

certainly a wholesale diversion from a specified route should work the same result. The conclusion is that defendant's truck was not operating under Cumberland's certificate at all.

Why Cumberland's insurance carrier felt impelled to pay half the claims is not within the scope of the instant case.

Defendant argues that the case of American Fidelity & Casualty Co. et al., v. Pennsylvania Casualty Co. et al., 97 F. Supp. 965 (E. D. Tenn., 1950) is controlling. The facts are altogether different because the leased equipment was not being operated by the insured carrier at the time of the accident. It was, in the instant case, due to the lease. And in the American case the insured carrier was not operating as an interstate carrier, while defendant in the instant case was.

On its motion for a new trial, defendant argues only two points. One is the alleged variance, which has been disposed of earlier in this opinion on the wording of the policy that plaintiff must pay *any* final judgment, whether taken adversely or by agreement after settlement. If defendant feels that a final judgment by agreement removes the right of appeal that it would have under an adversary judgment, it can only blame itself for buying such a policy.

The second point concerns the action of the trial judge in leaving the reasonableness of the settlement to the jury under instructions that plaintiff had the right to settle and in not letting defendant's president testify that he instructed plaintiff's counsel not to settle. The right to settle in its discretion is given plaintiff by the express terms of the policy, which also compels defendant to coöperate. Tysor's ideas about settling were therefore wholly irrelevant. Defendant argues that the policy cannot apply because plaintiff disclaimed, but this answers itself, since defendant's

position is that having breached the insurance contract by diverting the truck and then having brought about an accident by the negligence of its own driver, it can escape ultimate liability because its insurance company had to pay under the ICC rules.

The reasonableness of the settlements was left to the jury, since all other facts were admitted or established by documents. Plaintiff, believing it had a right of action against defendant, might have improved its public relations at defendant's expense by concluding an overgenerous settlement. The jury resolved this question in plaintiff's favor and we see no reason to disturb its verdict.

Questions relating to the admissibility, aside from those just mentioned, were not assigned as error or argued.

Defendant's motions are overruled and judgment is entered on the verdict.