[S.F. No. 24458. Oct. 20, 1983.]

HOME INDEMNITY COMPANY, Plaintiff and Appellant, v.
FREDERICK WILLIAM KING et al., Defendants and Respondents.

FREDERICK WILLIAM KING et al., Plaintiffs and Appellants, v.
TRANSPORT INDEMNITY COMPANY, Defendant and Respondent.

804

COUNSEL

Ralph A. Lombardi and Hardin, Cook, Loper, Engel & Bergez for Plaintiff and Appellant.

Michael P. McCabe, Trembath, McCabe & Schwartz, Trembath, McCabe, Schwartz, Evans & Levy and Bryce C. Anderson for Plaintiff and Appellant and Defendant and Respondent King.

No appearance for Plaintiff and Appellant and Defendant and Respondent Martin.

Toff, Toff, Newton & Toff, Toff & Newton, Melville A. Toff and Stephen L. Newton for Defendant and Respondent.

Janice E. Kerr, Hector Anninos and James T. Quinn as Amici Curiae, upon the request of the Supreme Court.

OPINION

KAUS, J.—

I.

This appeal stems from two actions consolidated for trial. Both deal with insurance coverage questions relating to an accident in which Frederick William King was injured by Tony Martin. The Home Indemnity Company (Home), plaintiff in the first action, appeals from a judgment in favor of defendants King and Martin, declaring Martin to be an insured under an automobile liability insurance policy Home had issued. King, plaintiff in the second action, appeals from a judgment in favor of defendant Transport Indemnity Company (Transport) declaring it not bound by a stipulated judgment in a previous action between King and Martin and granting it a trial de novo on all issues in that action.

II.

On January 31, 1972, King, an employee of Bonded Drayage Company (Bonded), drove a truck and trailer to the Oakland Army Terminal to deliver

and pick up cargo. Bonded owned the truck, but the trailer was owned by Transcon Lines (Transcon), another cargo carrier, and was being used pursuant to an interchange agreement. At the terminal, King hired Martin, an independent forklift operator, to load the trailer. While loading, Martin dislodged some crates in the trailer which fell on King and severely injured him.

Martin was insured by United States Fidelity and Guarantee Company (USF&G); Bonded was insured by Home and Transcon was insured by Transport. At the time of the accident, both Bonded and Transcon were common carriers licensed by the California Public Utilities Commission (PUC). Accordingly, the automobile insurance policies issued by both Home and Transport contained the standard form endorsement required by PUC General Order No. 100-F which prescribes limits of liability of $100,000 per person. Those were also the limits of the Home and USF&G policies. Transport's per person limit was $25,000.

King sued Martin. Martin was defended by USF&G which notified Home of the suit. After a court settlement conference, the action was settled by a stipulated judgment in favor of King for $300,000. USF&G agreed to pay its limit of $100,000. King agreed not to execute the balance against Martin, and Martin assigned all of his rights against any other carrier to King. Home had refused to defend Martin or to participate in the settlement.

King, Home and USF&G knew that the trailer was owned by Transcon, but did not notify Transcon or Transport of the action until after entry of the stipulated judgment.

Home brought an action for declaratory relief seeking a ruling that the liability policy it had issued to Bonded did not cover the accident. King and Martin sued Transport seeking a declaration that Martin was covered by the Transport policy and that Transport was therefore liable on the stipulated judgment. The two actions were consolidated for trial.

In the first action (*Home* v. *King and Martin*), the trial court found that Home's policy and the PUC endorsement to that policy together provided Martin with coverage for the entire unpaid balance of the judgment—$200,000. In the second action—*King and Martin* v. *Transport*—the court found that Martin was Transport's insured, but that Transport was not bound by the stipulated judgment because it had not been given notice of the accident, the action between King and Martin, or the settlement of that action. The court concluded that Transport was entitled to a trial de novo on all issues.

III. *Home v. King and Martin*

Under the comprehensive liability portion of Bonded's insurance policy, Home agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . arising out of the ownership, maintenance or use, including loading and unloading, of any automobile . . . ." The policy defined the "persons insured" as the named insured and as: "(c) any other person while using an owned automobile or a hired automobile with the permission of the named insured . . . *but with respect to bodily injury or property damage arising out of the loading or unloading thereof, such other person shall be an insured only if he is*: [¶] *1. a lessee or borrower of the automobile, or* [¶] *2. an employee of the named insured or of such lessee or borrower* . . . ." (Italics added.) Under the facts of this case, the italicized language appears to exclude Martin as an insured unless he was a borrower of Bonded's equipment.

Endorsement No. 5 then sets forth an exception to this limitation: "It is agreed that the insurance applies with respect to commercial automobiles, subject to the following additional provisions: (a) The loading and unloading limitation of paragraph (c) of the 'Persons Insured' provision does not apply to any person or organization or any agent or employee thereof engaged in the business of transporting property by automobile for the named insured or for others." Under the facts of this case this endorsement does not aid Martin or King, unless the forklift was an automobile.

The policy also contained the standard endorsement required by PUC General Order No. 100-F stating that the policy would cover "within the limits of liability hereinafter provided [$100,000], any final judgment rendered against the insured for bodily injury to or death of any person . . . resulting from the operation, maintenance, or use of motor vehicles for which a . . . permit is required. . . ."[1] The endorsement also provided that within the limits of liability "it is further understood and agreed that no *condition, provision, stipulation,* or *limitation* contained in the policy, or any other endorsement thereon or violation thereof, of this endorsement, by the insured, shall relieve the Company [Home] from liability hereunder or from the payment of any such final judgment. . . . However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment . . . that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." (Italics added.)

---

[1] It is not in dispute that Bonded was engaged in an activity for which a permit was required.

The trial court found that forklift operator Martin was Home's insured both because he was a "borrower" of the truck within the meaning of paragraph (c) of the policy and because by operating the forklift, he was "engaged in the business of transporting property by 'automobile' for the named insured" within the meaning of endorsement No. 5 of the policy. In addition, the court found that Martin was an insured under the PUC endorsement. The court concluded that the policy provided coverage to the extent of $100,000 and that the PUC endorsement cumulatively provided an additional $100,000.

### a. *PUC Endorsement*

Home contends that the trial court erred in finding that the PUC endorsement nullified the limitation to the loading and unloading provisions of its policy. Its argument is, first, that even by its own terms the PUC endorsement does not protect Martin as an insured and, second, that it is invalid because Insurance Code section 11580.1, subdivision (b)(4)(i), enacted in 1970—which authorizes the limitation as to "persons insured" with respect to loading and unloading operations—expresses the "total public policy" of the state and thus overrides any contrary requirements of PUC General Order No. 100-F and the endorsement issued pursuant thereto. (Ins. Code, § 11580.05.)[2]

With respect to its first point, Home asserts that the PUC endorsement does not operate to broaden the definition of insured to include Martin. The point has no merit. The basic definition of "insured" includes the named insured—Bonded—and "any other person while using an owned automobile . . . with the permission of the named insured."[3] This, of course, is the classic definition of "insured" in automobile liability policies, derived from the language defining the owner's vicarious liability (Veh. Code, § 17150) and enshrined in the Financial Responsibility Law (Veh. Code, § 16451) as well as in section 11580.1 of the Insurance Code. (See generally *Metz* v. *Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45, 50-51 [109 Cal.Rptr. 698, 513 P.2d 922].) As noted, the policy then limits the definition of insured "with respect to bodily injury . . . arising out of the loading or unloading [of the owned automobile] . . . ." This limitation would not have been allowed under section 11580.1 as first enacted in 1963. (Stats. 1963, ch. 1259, § 1, p. 2780.) It did, however, become permissible by the 1970 amendment of that section (Stats. 1970, ch.

---

[2]Unless otherwise noted, all statutory references are to the Insurance Code.

[3]"Use" would include loading and unloading even if the policy did not so provide. (*International Business Machines Corp.* v. *Truck Ins. Exch.* (1970) 2 Cal.3d 1026, 1029 [89 Cal.Rptr. 615, 474 P.2d 431].) The Home policy does, however, expressly refer to "use, including loading and unloading, . . ."

300, § 4, p. 573) which, with regard to loading and unloading, expressly provides that "the insurance may be *limited* to apply only to the named insured . . . ." (Ins. Code, § 11580.1, subd. (b)(4)(i); italics added.) ██ Having in mind the applicable rules concerning the interpretation of insurance policies, it is impossible not to construe the limitation permitted by the Insurance Code as the kind of limitation—as distinguished from a "condition," "stipulation" or "provision"—to which the PUC endorsement refers: that is, a limitation which Home may not assert against a judgment creditor.[4] Therefore, if the PUC endorsement applies, it covers judgments against the named insured as well as "any other person while using an owned automobile," which, of course, includes Martin.

With respect to Home's second point, it argues that before 1970 it was the public policy of the state, as expressed in former section 11580.1, that every automobile insurance policy was deemed to include a provision insuring a permissive user of a vehicle to the same extent as the named insured. As noted, a person engaged in loading and unloading a truck is a permissive user. (*Glens Falls Ins. Co.* v. *Globe Indem. Co.* (1969) 276 Cal.App.2d 643 [81 Cal.Rptr. 28]; see former § 11580.1, subd. (d).) In 1970, the Legislature enacted a new version of section 11580.1 which permitted limitations on coverage for loading and unloading. (§ 11580.1, subd. (b)(4)(i).)

Home's argument that the PUC endorsement provisions have been superseded by section 11580 et seq. is premised on the Legislature's statement in section 11580.05 as follows: "The Legislature declares that the public policy of this state in regard to provisions authorized or required to be included in policies affording automobile liability insurance or motor vehicle liability insurance issued or delivered in this state shall be as stated in this article [§§ 11580-11586], that this article expresses the total public policy of this state respecting the content of such policies. . . ."

King and the PUC, which has filed an amicus brief, effectively counter this argument. They assert that the PUC endorsement provisions have not

---

[4]Home points out that certain federal cases such as *American Fidelity and Cas. Co.* v. *Pennsylvania Cas. Co.* (E.D.Tenn. 1950) 97 F.Supp. 965, 970-971, affirmed 188 F.2d 364 (6th Cir. 1951) certiorari denied 342 U.S. 860 [96 L.Ed. 647, 72 S.Ct. 88], interpret the word "insured" within an endorsement issued pursuant to the Federal Motor Carrier Act (49 U.S.C.A. § 315) to refer only to the carrier. It is, however, evident that this interpretation rests entirely on a construction of the federal statute and, therefore, has no relevance to our problem. A parallel exercise in statutory interpretation as far as California is concerned, would inevitably have to rest on the definition of an "owner's policy of motor vehicle liability insurance" contained in section 16451 of the Vehicle Code which demands that such a policy must include, as an insured, any permissive user of the motor vehicle. As we have seen—see footnote 3, *ante*—this includes anyone loading or unloading the vehicle.

been superseded by section 11580 et seq. because that legislation simply does not cover insurance requirements for "highway carriers" which are regulated by the PUC. (See Pub. Util. Code, §§ 3511, 3541.) Section 11580.05 refers to "automobile liability insurance" or "motor vehicle liability insurance" policies, but neither it nor any of the other sections in article 2 [§§ 11580-11586] defines such policies. Vehicle Code section 16450, however, defines a "motor vehicle liability policy" as a policy of "liability insurance . . . ." Section 108, subdivision (a) defines liability insurance as including insurance against loss resulting from liability for injury to persons or property, but it specifically excludes "common carrier liability" insurance. Section 110 defines "common carrier liability insurance" as including insurance against loss resulting from liability of a common carrier for accident or injury and as excluding "liability or workers' compensation insurance."[5]

Common carrier liability insurance is a distinct type of insurance, separate and apart from ordinary motor vehicle or automobile liability insurance. (See also Veh. Code, §§ 16500, 16500.5, 16503, which exclude vehicles subject to regulation by the PUC from general requirements for commercial passenger vehicle insurance.) Common carrier liability insurance is not encompassed within the general category of "liability insurance" that includes automobile liability insurance. Significantly, while article 1 of chapter 1 of part 3 of the Insurance Code provides in section 11550 that "[a]s used in this article, the term 'liability' means liability and common carrier liability insurance," article 2—in which sections 11580.05 and 11580.1 are found— contains no such definition. Common carrier liability insurance is therefore not encompassed within the general category of "liability insurance" covered by article 2. Accordingly, the declaration of public policy set forth in section 11580.05 does not apply to common carrier insurance requirements, which are regulated by the PUC. If, in 1970, the Legislature had wanted to cover common carrier insurance requirements in section 11580.1, it surely would have amended the Public Utilities Code provisions, which had been in existence since 1951 and, on their face still authorized the PUC to regulate insurance requirements. (See Pub. Util. Code, §§ 3631-3635.)

---

[5]Home argues that the separate definitions of liability and common carrier liability insurance in sections 108 and 110 are irrelevant because the definitions of classes of insurance set forth in sections 100-123 are relevant only to the scope of an insurer's authority to conduct business. While we agree that section 680 limits an insurer to the transacting of classes of insurance authorized by its charter, we do not agree that that statute necessarily demonstrates the lack of relevance of the different definitions to all other subjects. Indeed, part 3 of the Insurance Code (§§ 11550-11881), in which section 11580.05 is contained, maintains the distinction in its title—"Liability, Workers' Compensation, and Common Carrier Liability Insurance." Provisions affecting common carrier liability insurance are contained in article 1 of that part in sections 11550-11558.

Our decision in *Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32] is consistent with this conclusion. In *Samson* we held that the mandatory insurance coverage set forth in the standard PUC endorsement applied to all vehicles used in conducting the service for which a PUC permit was required, even though they were not designated in the carrier's underlying policy. Thus, a pickup truck used for incidental services, such as carrying tools, spare parts and wide load signs, was included within the scope of the PUC endorsement although it was not actually used for carrying cargo and was not described in the policy. This was true even though section 11580.1, subdivision (c)(8) allowed an automobile insurance policy to exclude designated vehicles from coverage.[6]

Home's reliance on *Travelers Ins. Co.* v. *Transport Indemn. Co.* (1972) 6 Cal.3d 514 [99 Cal.Rptr. 672, 492 P.2d 683] and *Farmers Ins. Exchange* v. *Cocking* (1981) 29 Cal.3d 383 [173 Cal.Rptr. 846, 628 P.2d 1] is unpersuasive. Neither case had to do with the question at issue here.

The issue in *Travelers* was which insurance policy was primary. We rejected a contention that the policy which contained a PUC endorsement should be declared primary and noted that the newly enacted section 11580.9, subdivision (c), although not effective in the case at hand, would settle the question for the future by declaring the policy covering the premises on which the loading or unloading occurred to be primary rather than the policy covering the motor vehicle "notwithstanding anything to the contrary in any endorsement required by law to be placed on such [motor vehicle] policy." (§ 11580.9, subd. (c).)

*Farmer's Ins. Exchange* v. *Cocking, supra,* involved a constitutional challenge to section 11580.1, subdivision (c), which authorizes insurers to exclude from coverage an insured's bodily injury liability to any other person insured under the policy. Our statement there that section 11580.05 expresses the "total public policy of the state regarding automobile liability insurance" was not made with reference to the PUC's jurisdiction over the insurance requirements placed on common carriers.[7]

---

[6]We reject Home's asserted interpretation of *Samson* as suggesting that an exclusion of coverage for personal use of the vehicles would have been permissible under the PUC general orders and required endorsement. (30 Cal.3d at p. 236.) In *Samson* we merely rejected the insurer's assertion of an exclusion for personal use of the vehicle on the ground that nothing in the endorsement, general order or underlying policy contained such an exclusion. We did not consider the question of whether an exclusion for personal use, which is permitted by section 11580.1, subdivision (b)(3), would be superseded by a PUC endorsement and general order without such limitations.

[7]There is obviously a plausible argument to be made that it is really quite immaterial whether General Order No. 100-F became a dead letter when section 11580.1 was passed in 1970. Whether or not the PUC still had the right to demand the endorsement, the plain fact is that Home issued it and was compensated for it. Refusing to provide paid-for protection seems a poor way of testing the powers of the PUC. We refrain, however, from further comment on the point, since it has not been argued.

## b. *Martin as a "Borrower"*

Home contends that the trial court erred in finding that forklift operator Martin was an insured under the policy because he was a "borrower" of the truck and trailer.[8] We agree. The term "borrower" is not defined in the policy. ■ "Although ambiguities or uncertainties in an insurance policy must be resolved against the insurer, nevertheless, the policy must be given a reasonable interpretation and the words used are to be given their common, ordinary and customary meaning." (*United Services Automobile Assn. v. Warner* (1976) 64 Cal.App.3d 957, 962 [135 Cal.Rptr. 34].)

The term "borrow" has been defined as: "To receive temporarily from another, implying or expressing the intention either of returning the thing received or of giving its equivalent to the lender." (Webster's New Internat. Dict. (3d ed. 1961).) In a case involving a similar situation, a borrower was defined as someone who, with the permission of the owner, has temporary possession and use of the property for his own purposes; possession connotes the right to exercise dominion and control. (*Liberty Mut. Ins. Co.* v. *Am. Emp. Ins. Co.* (Tex. 1977) 556 S.W.2d 242, 244-245 [evidence insufficient to support finding that forklift operator unloading goods from a truck was a "borrower" of the truck].)

■ King does not dispute this definition. He asserts, however, that forklift operator Martin fits the definition by virtue of his contract with King and Bonded. He argues that Martin had possession and control of the truck and trailer because if moving the rig had been necessary for the loading operation, both King and Bonded would have been under an implied contractual obligation of good faith and fair dealing to permit him to do so. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 576, p. 493.)

We are not persuaded. The only evidence of dominion and control comes from this implied contractual obligation of good faith and fair dealing. There was no evidence that Martin either moved the rig or had express authority to do so. Nor, for that matter, was there any evidence of the authority of forklift operators generally with respect to vehicles being loaded or unloaded. We find the evidence insufficient to show that Martin ex-

---

[8]Our reason for discussing the finding that Martin was a "borrower" of the truck and, later, the finding that the forklift was an automobile, is the trial court's theory that the $100,000 limit of the PUC endorsement and the basic policy limit of $100,000 were cumulative.

ercised the requisite dominion and control over the truck and trailer to be a "borrower" under the terms of the policy.[9]

## c. *Forklift as an Automobile*

Home finally contends that the trial court erred in finding that the forklift operated by Martin was an "automobile" within the meaning of endorsement No. 5 in the policy. The policy states: "'Automobile' means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment; . . . 'mobile equipment' means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the named insured . . . or (3) designed for use principally off public roads. . . ."

■ Home is correct in asserting that the forklift was not an "automobile" within the meaning of the policy. A forklift obviously is designed for "use principally off public roads." (See *California Packing Corp.* v. *Transport Indem. Co.* (1969) 275 Cal.App.2d 363 [80 Cal.Rptr. 150].) Cases in which forklifts have been found to be "automobiles" have not involved the same specificity of definition that is contained in the present policy. (See *Argonaut Ins. Co.* v. *Transport Indem. Co.* (1972) 6 Cal.3d 496, 508-509 [99 Cal.Rptr. 617, 492 P.2d 673]; *Pacific Employers Ins. Co.* v. *Maryland Casualty Co.* (1966) 65 Cal.2d 318, 324 [54 Cal.Rptr. 385, 419 P.2d 641].)

The upshot of these considerations is that Martin is entitled to $100,000 coverage under the PUC endorsement to the Home policy. Since we disagree with the trial court's findings that he was a borrower of Bonded's truck and that the forklift was an automobile, we need not discuss the trial court's theory that under its findings Martin was entitled to coverage in the amount of $200,000. (See fn. 8, *ante.*)

## IV. *King and Martin v. Transport*

■ Transport was the insurer of Transcon, owner of the trailer. The trial court found that Martin was an insured under that policy[10] and that the

---

[9]We need not address King's argument about the difference in language between the policy coverage for "lessees and borrowers" and the authority under section 11580.1, subdivision (b)(4) to limit coverage to "lessees and bailees" since there is no evidence that Martin was a bailee. (See Civ. Code, § 1814; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 109 et seq., p. 1701 et seq.)

[10]Unlike the Home policy, the Transport policy contained no limitation on the definition of an insured with respect to loading and unloading.

stipulated judgment between King and Martin was validly entered and reasonable. The court concluded, however, that the judgment was not binding on Transport because the parties had failed to notify it of the accident or litigation between King and Martin. The court concluded that Transport was entitled to a trial de novo on all issues in the action between King and Martin.

King appeals. He contends that the trial court erred in granting Transport a new trial because the company was obligated by the express terms of the PUC endorsement attached to its policy to satisfy the judgment notwithstanding any lack of notice. We agree.

Under the terms of the PUC endorsement, Transport agreed to pay "within the limits of liability hereinafter provided [$100,000], *any final judgment* rendered against the insured for bodily injury or death of any person . . . resulting from the operation, maintenance, or use of motor vehicles for which a . . . permit . . . has been issued to the insured by the [PUC] . . . ." (Italics added.) The endorsement also provided that ". . . no condition, provision, stipulation, or limitation contained in the policy . . . shall relieve [Transport] from liability hereunder or from the payment of *any such final judgment,* irrespective of the financial responsibility or lack thereof . . . of the insured." (Italics added.) The endorsement further provided that all terms, conditions, and limitations in the underlying policy would remain in effect between Transport and the insured and that Transport could seek reimbursement from its insured for any payment made that it would not have had to make but for the provisions of the endorsement.

Although an insurer generally is not bound by a judgment unless it had notice of the pendency of the action (see *Samson* v. *Transamerica Ins. Co.,* *supra,* 30 Cal.3d at p. 238), that is not true where the specific provisions of the PUC endorsement obligate the insurer to pay a judgment against the insured regardless of whether the insured had complied with all conditions of the policy, such as notice. In *Kruger* v. *California Highway Indem. Exch.* (1927) 201 Cal. 672 [258 P. 602], we held that in the absence of fraud or collusion, a judgment which has been obtained by an injured person against the insured may be binding upon the insurer even though it had no notice of the action if specific policy provisions so provide. *Kruger* involved an insurance policy provision required by a city ordinance for jitney bus owners which guaranteed payment of any final judgment rendered against the owner within specified dollar limits " 'irrespective of the financial responsibility or any act or omission of said jitney bus owner. . . .' " (*Id.* at p. 674.) We held that the insured's failure to notify the insurer of the action—as required by the policy—did not absolve the insurer of its duty to

satisfy the judgment under the specific language guaranteeing payment of a final judgment obtained against its insured.

Under *Kruger* the trial court erred in finding Transport not bound by the stipulated judgment against its insured. The court found no fraud or collusion, and the PUC endorsement obligated Transport to pay any final judgment against its insured regardless of whether the insured had complied with the policy conditions. Thus, the policy provision requiring notice as a condition of liability was waived by the PUC endorsement.

Transport argues that even if the notice provision was waived, it should not be bound by the PUC endorsement because the public policy sought to be promoted by the endorsement was satisfied by USF&G's payment of $100,000 to King. This argument is unsupported by any apposite authority and was rejected long ago in *Giordano* v. *American Fidel. & Cas. Co.* (1950) 97 Cal.App.2d 309, 312-314 [217 P.2d 444], where the court held that the insurer was not relieved of its obligation under a similar endorsement simply because the injured party had received partial payment of the judgment from others in an amount equal to the limit of liability under the endorsement.

### V. *Conclusion*

The judgment in *Home Indemnity* v. *King* is reversed with directions to enter judgment in accordance with the views expressed herein. The judgment in *King* v. *Transport Indemnity* is also reversed, with directions to enter judgment in favor of plaintiffs King and Martin in the amount of $100,000.

Bird, C. J., Mosk, J., Richardson, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

The petition of appellant King for a rehearing was denied November 30, 1983.