[No. B167676. Second Dist., Div. Eight. Dec. 27, 2004.]

CITY OF LOS ANGELES, Plaintiff and Appellant, v.
ALLIANZ INSURANCE CO., et al., Defendants and Respondents.

## COUNSEL

Young & Nichols, Steve W. Nichols, Todd Gall; Shernoff Bidart & Darras, Michael J. Bidart and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Hager & Dowling and John V. Hager for Defendants and Respondents.

## OPINION

**BOLAND, J.—**

### SUMMARY

This case presents the question whether a shipper, who directs the loading of a truck on its premises and is to that extent a "user" of the truck, is also a "borrower" of the truck, and therefore an "insured" under the provisions of the trucking company's insurance policy. We conclude the shipper did not exercise the requisite dominion and control over the truck to qualify as a borrower under the terms of the policy.

### FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit has its origin in an accident that occurred on the premises of the City of Los Angeles (City). Truck driver Brian Haygood, who was employed by MSM Trucking, was injured when he fell off an I-beam during the weighing of his truck after it had been loaded with biosolids (treated sewage) at the City's Terminal Island treatment facility. After Haygood sued the City, the City sought a defense and indemnity from MSM Trucking's insurers, Allianz Insurance Company, Fireman's Fund Insurance Company and National Surety Corporation.[1] The insurers refused to defend the City, taking the position that the motor vehicle liability policy issued to MSM Trucking did not provide coverage to the City for the injury Haygood suffered as MSM's employee

---

[1] Apparently only National Surety Corporation's policy is at issue on this appeal.

while his truck was being loaded on City property. The City was found liable for Haygood's injuries.

The City then sued the insurers, and a single issued was bifurcated and tried to the court. The issue tried was whether, under the terms of MSM's insurance contract, the City was a "borrower" of MSM's truck when Haygood was injured. MSM's insurance contract covered payment of "all sums an insured legally must pay as damages because of bodily injury . . . caused by an accident and resulting from the ownership, maintenance or use of a covered auto." In addition to MSM, the insureds covered by the policy included, by virtue of an exclusion from an exception to coverage, MSM's "employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered auto." Thus, if the City was a borrower of the truck during the loading process, it was an insured under MSM's policy and was entitled to coverage for Haygood's injuries.

At trial, counsel stipulated to undisputed facts, and two witnesses— Haygood and an MSM management employee—testified. The facts found by the trial court, in summary, were these. San Joaquin Composting, Inc. (SJC) entered into a written contract to purchase biosolids from the City. The contract required SJC to haul the biosolids away from the City's Terminal Island treatment plant. SJC was an independent contractor, responsible under the contract for operating its equipment, including positioning the equipment under the loading chutes. The contract included protections against spilling once the vehicle left City property, and specified sealing features on the vehicle, tarping of the vehicle, and inspection of the loaded vehicle before it left the City's property. The City provided SJC with detailed loading and weighing procedures that any vehicle operator was required to know before coming onto the City's property to pick up a biosolids load. The City maintained the pickup site and provided the loading chutes, scales, weighing office, and gates on the premises.

SJC hired MSM as a trucker to remove the biosolids from the City's property and transport them to SJC's depot. On the day of the accident, Haygood drove a tractor/trailer rig, or truck, onto the City's property to receive a load of biosolids. The trial court described the ensuing procedures: "Haygood, while on the City's property, followed the instructions of the City's employees as to the route along which he should drive the truck and as to how the tractor/trailer should be positioned to receive the load. In particular, during the pick-up, the trailer had to be situated so that the biosolids could be dumped into the trailer; and the trailer had to be weighed both empty and full, so the load weight could be documented. The loaded trailer had to be inspected by [the] City before it departed to insure that the load would not spill on the highway. The City's employees directed Haygood

in these operations but they did not operate nor physically enter the tractor/trailer. [¶] Mr. Haywood was injured when he left his cab so the vehicle could be weighed and fell from an I-beam structure on the scale." The trial court further found that: "[T]he driver was not authorized to leave after taking on a load until the City had provided the driver with the load weight paperwork and had inspected the vehicle for cleanliness and adequate tarping to prevent load spillage. The vehicle, however, entered the City's premises in furtherance of MSM's own commercial purposes, that is, in the performance of its hauling contract with San Joaquin Composting."

The trial court analyzed the applicable precedents and concluded that the issue whether, under the terms of a trucker's insurance policy, a landowner has "borrowed" a vehicle hired for work on its premises "turns on a factual determination: whether the landowner was so involved in the operation that he took over the control of the truck while it was on his property." On this point, the court found that "the City, with respect to directing Haygood's procedures during the biosolids-loading operation, did not exercise such dominion and control of MSM's truck that the City can be said, within the meaning of MSM's insurance policy, to have 'borrowed' Haygood's truck. Haygood maintained control over his truck at all times during the biosolids-loading operation, merely following direction from City's employees as to how he should position his truck and submitting to the weighing and inspection procedures that were pre-specified in the contract between the City and San Joaquin Composting, the party that directed MSM's truck to the City's Terminal." The court concluded the City was not a borrower of MSM's truck and therefore was not covered under MSM's policy.

Judgment was entered for the insurers on March 24, 2003, and the City filed this timely appeal.

## DISCUSSION

The sole question in this case is whether the City was a borrower of MSM's truck. The trial court correctly determined this question in the negative.[2]

■ Although the insurance policy does not define "borrower," the Supreme Court has provided some guidance in a case involving similar policy language. That case referred to a definition of a borrower as "someone who, with the permission of the owner, has temporary possession and use of the

---

[2] The City requests judicial notice of Haygood's judgment against the City, with its findings of fact and conclusions of law, entered June 5, 2001. The request is denied, as the judgment has no relevance to the issues before this court.

property for his own purposes; possession connotes the right to exercise dominion and control." (*Home Indemnity Co. v. King* (1983) 34 Cal.3d 803, 813 [195 Cal.Rptr. 686, 670 P.2d 340] (*Home Indemnity*), citing *Liberty Mut. Ins. Co. v. Am. Emp. Ins. Co.* (Tex. 1977) 556 S.W.2d 242, 244–245 [20 Tex. Sup. Ct. J. 494].) *Home Indemnity* concluded a forklift operator who was loading a trailer did not exercise "the requisite dominion and control over the truck and trailer to be a 'borrower' under the terms of the policy." (*Home Indemnity, supra*, 34 Cal.3d at pp. 813–814, fn. omitted.) Accordingly, one point is beyond dispute: the exercise of "dominion and control over the truck" is indispensable to a finding that the City was a "borrower" of MSM's truck under the terms of the insurance policy.

■　We find no flaw in the trial court's determination that the City did not exercise such dominion and control of MSM's truck that it can be said to have borrowed the truck. This conclusion is supported by both case precedents and public policy as enunciated by the Supreme Court. We discuss the cases in the context of the arguments raised by the City.

■　The City contends it was a "user" of the truck under the controlling case law, which holds that "use" of a vehicle includes its loading and unloading. (E.g., *Home Indemnity, supra*, 34 Cal.3d at pp. 809–810.) From this principle, which is correct, the City posits that "it is difficult to use a truck one does not own unless one has borrowed or hired it," and that the same facts establishing the City was a user of the truck—its control over the loading process—also establish it was a borrower of the truck. We do not think so, for several reasons.

First, the City's initial premise is incorrect. One can load or unload—and therefore "use"—a truck one does not own and has not borrowed or hired.[3] That much is plain from *Home Indemnity, supra*, 34 Cal.3d 803, in which the Supreme Court concluded the forklift operator hired to load a trailer was not a borrower, although he was necessarily a user. Because "[t]here was no evidence that [he] either moved the rig or had express authority to do so," or that forklift operators generally had authority with respect to vehicles being loaded or unloaded, the forklift operator did not exercise "the requisite dominion and control over the truck and trailer to be a 'borrower' under the

---

[3] Coverage of permissive users of a vehicle is incorporated by law in every motor vehicle policy (*International Business Machines Corp. v. Truck Ins. Exch.* (1970) 2 Cal.3d 1026, 1028–1029 [89 Cal.Rptr. 615, 474 P.2d 431]), and the "use" of a vehicle includes its loading and unloading. (*Id.* at p. 1029.) However, in 1970, the Legislature enacted a new version of Insurance Code section 11580.1, which permits limitations on coverage for loading and unloading. Coverage may be limited to the named insured, relatives resident in the named insured's household, a lessee or bailee of the motor vehicle, or an employee of any of those persons. (Ins. Code, § 11580.1, subd. (b)(4)(i).) In this case, MSM's policy limited coverage to the named insured, its partners, a lessee or borrower or any of their employees.

terms of the policy." (*Id.* at pp. 813–814, fn. omitted.) Accordingly, the suggestion that user status establishes borrower status is demonstrably erroneous.

Second, the City's reliance on its "control over the loading process" to establish its status as a borrower of MSM's truck is also misplaced. The pertinent question in determining whether the City borrowed MSM's truck is whether the City had "the requisite dominion and control over the truck" (*Home Indemnity, supra,* 34 Cal.3d at p. 814), not whether it directed or controlled "the loading process." In short, we do not accept the proposition that "control over the loading process" is the equivalent of "dominion and control over the truck." The fact that MSM's drivers were required to comply with the City's loading procedures and with directions from City personnel— such as where to position the truck to receive the load, where to weigh it, where to unload any excess, and so on—does not, it seems to us, constitute the exercise of dominion and control over the truck. On the contrary, and as the trial court pointed out, Haygood maintained control over his truck at all times during the loading operation, and merely followed directions as to positioning, weighing and inspection procedures provided in the City's contract with SJC. While the City's contract with SJC made SJC—and thus MSM—responsible for "complying with the loading procedures established by the CITY," it also expressly made SJC "responsible for operating its equipment including positioning the equipment under the loading chutes [and] specifying to CITY the tonnage to be loaded . . . ." Indeed, the contract also required SJC to "ensure trucks do not exceed the maximum legal limit by unloading excess biosolids . . . onto the grit pad," and SJC was "responsible for minimizing the total duration that a truck spends at City sites, from time of entry into the plant to time of exiting plant, by expediting the loading process . . . ." On these facts, the requisite "dominion and control over the truck" by the City does not exist. (*Home Indemnity, supra,* 34 Cal.3d at p. 814.)

Our conclusion comports with case precedents. The City relies on *Travelers Indemnity Co. v. Swearinger* (1985) 169 Cal.App.3d 779 [214 Cal.Rptr. 383] (*Swearinger*) for the proposition that it is not necessary to take over the physical operation of a vehicle in order to "borrow" it. The point is correct, but it does not assist the City in this case.[4] In *Swearinger*, the court concluded that a student, who was driving her parents' car for school district purposes, was an insured under the school district's policy, because the

---

[4] The trial court, according to the City, erroneously concluded the City could not be a borrower unless it took over the physical operation of the truck. That is not the import of the trial court's decision. The court merely recognized that the cases indicate a property owner, who takes over from the driver the operation of his vehicle, exercises dominion and control over the vehicle, and therefore is deemed a borrower. The trial court expressly recognized that one can borrow a vehicle without having physical possession of it, where the borrowed vehicle

school district borrowed the car from the student's parents for its use in ferrying visiting students to and from the high school. (*Id.* at pp. 782–785.) The court rejected the insurer's argument that the district "never had dominion and control of the [family's] vehicle because it never had possession or custody of it," concluding the argument was "founded upon a question-begging view of dominion and control which . . . [was] inconsistent with the implications of the contract's use of 'borrow.' " (*Id.* at p. 786.)[5] *Swearinger* distinguished *Home Indemnity*, and emphasized the school district's use of the family's automobile "for its purpose in transporting guest students." (*Swearinger, supra,* 169 Cal.App.3d at pp. 787–788.)[6]

*Swearinger* is distinguishable from *Home Indemnity*, and from this case. As the trial court pointed out, in *Swearinger* the school district was held to be a borrower because it solicited the use of and then used a private vehicle for its purpose of transporting guest students to a school-sponsored function. Thus, it was the use of the vehicle for the school district's purposes that constituted the district's exercise of dominion and control over the vehicle. In *Home*

---

is used solely for the borrower's purposes, as in *Swearinger, supra,* 169 Cal.App.3d at pages 786–788.

[5] After analyzing the usage of the term "borrow" in the policy, the court observed that the school district could operate only through individuals, including its employees, and that under the policy terms "a borrowing can occur if [the district] permits the employee's use of his or her vehicle on its [the school district's] errand." (*Swearinger, supra,* 169 Cal.App.3d at p. 785.) "If that is so, [the district] can borrow a vehicle whenever it properly gains the use of a third party's vehicle for its purposes whatever may be said of the employee's dominion over the vehicle (by ownership) or physical possession of it (by driving it)." (*Ibid.*)

[6] The City also cites *Monolith Portland Cement Co. v. American Home Assur. Co.* (1969) 273 Cal.App.2d 115 [78 Cal.Rptr. 113], arguing "it recognizes that a party loading a truck can borrow it without physically operating the truck." While that may be so, the point begs the pertinent question, which is whether the loader has dominion and control over the truck. *Monolith,* which predated the Supreme Court's decision in *Home Indemnity,* involved the construction of the term "hired automobile." In *Monolith,* a cement quarrier sold a truckload of cement to a customer in Capistrano and called McKay Trucking Company to obtain the use of one of its trucks and a driver to transport the cement to Capistrano. A driver arrived with an empty truck to be loaded by Monolith employees. Those employees negligently used a hose to load the cement, causing it to spray over and injure the driver, who sued Monolith and recovered a judgment. (*Monolith, supra,* 273 Cal.App.2d at pp. 116–117.) The question was whether the truck was a "hired automobile," that is, " 'an automobile used under contract in behalf of, or loaned to, the named insured [Monolith]. . . .' " (*Id.* at p. 118; see also *id.* at p. 119.) The court concluded that the truck was "used under contract in behalf of" Monolith, and therefore was a hired automobile (*id.* at p. 120), and that even assuming the absence of a hiring contract, the truck was "loaned to" Monolith for the purpose of the shipment to Monolith's customer. (*Id.* at p. 122.) The trial court found the truck was under Monolith's dominion and control, and the Court of Appeal concluded that determination was supported by substantial evidence. Indeed, the Court of Appeal observed that Monolith used the truck by loading it with cement for delivery to its consignee, and "[i]t must be implied that after delivery of the cement the truck would be returned to [the trucking company]." (*Id.* at pp. 121–122.) The facts in this case are significantly different, and fully justified the trial court's conclusion the City did not have dominion and control of the truck.

*Indemnity*, by contrast, the forklift operator, while loading and therefore necessarily using the truck, did not move it or otherwise have authority to use it for his own purposes, and was found not to have the requisite dominion and control over the truck to be a borrower. The same contrast exists in this case. As the trial court stated: "MSM did not put its truck in the service of the City; it brought its truck on to the City's property to perform a hauling contract it had entered into in furtherance of its own business interests."[7]

The City insists that it used MSM's truck for its own purposes, because it was loading it with the City's property (the biosolids).[8] That is not enough to constitute "dominion and control" over a truck that is located on the City's premises for its own purposes, namely to fulfill the trucking company's contract with a third party. In *Swearinger*, the vehicle was used for one purpose—the school district's purpose of transporting guest students, and the district was therefore a borrower. Here, the MSM truck was used for MSM's purposes, and the City's use in loading it was, at most, secondary. In any event, the City's control over the loading process did not negate MSM's dominion and control of the vehicle. (See *Indemnity Ins. Co. v. Pacific Clay Products Co.* (1970) 13 Cal.App.3d 304, 314 [91 Cal.Rptr. 452] [rejecting claim that truck was "loaned to" general contractor which controlled truck unloading operation at construction site; "the control exercised by [the contractor] over the loading operation which supports the finding it was using the truck at the time of the accident, did not involve control over the truck as such, its possession or custody"].) In short, while the indicia of dominion and control over a vehicle may vary with the circumstances, none of the indicia are sufficient to establish that the City borrowed MSM's truck. MSM had possession and custody of the truck; MSM was responsible for positioning the truck under the loading chutes and for expediting the loading process; and the truck was at all times being used to accomplish MSM's business purposes.

Finally, both parties cite *International Business Machines Corp. v. Truck Ins. Exch., supra,* 2 Cal.3d 1026 (*IBM*). In *IBM*, the Supreme Court held that "the mere maintenance of premises used for loading or unloading is not in itself a sufficient basis upon which to find the shipper [IBM] a 'user' of the vehicle . . . ." (*Id.* at p. 1032.) *IBM* is not directly relevant, as it presented

---

[7] The court continued: "MSM, in that transaction, assumed the risk of injury arising only from its own actions. The accident did not arise from its own actions or those of its driver, but rather from a deficiency in the premises that the driver encountered while on the City's premises."

[8] Ownership of the biosolids passed from the City to San Joaquin Composting when the truck was inspected by the City after loading, and the truck was then permitted to leave the premises.

a question of user status, not borrower status.[9] The case is noteworthy, however, for its observation that "[a] holding that IBM is a 'user' of the truck and that the trucker's carrier should meet the loss would free the dock owner from responsibility for the maintenance of its own premises, and fasten liability upon the insurance carrier whose insured was the least culpable." (*Ibid.*)[10] The same observation would apply in this case, if the concept of borrowing a vehicle were stretched to encompass circumstances where the City merely supervises and directs the loading process.

In sum, the sine qua non of borrowing a vehicle is the exercise of dominion and control over the vehicle, whether through the use of the vehicle in the pursuit of one's own purposes or through possession and custody of the vehicle. In this case, none of the indicia of dominion and control are present. The City did not have possession or custody of the truck. Further, it did not have the use of the truck for its own purposes, to the exclusion of its owner. On the contrary, the truck was at all times being used to perform MSM's hauling contract with San Joaquin Composting. Under these circumstances, the requisite dominion and control over the truck was lacking, and the City was not a borrower under the terms of the policy.

---

[9] In *IBM*, two employees of a trucking company drove a truck to the IBM premises, and were directed by IBM to move some furniture around IBM's premises, and later to move a chair and desk from an IBM building to the trucking company's warehouse. While moving the furniture toward the truck on IBM's premises, one of the men was injured when he slipped on an IBM eraser. He sued IBM, and IBM tendered its defense to the trucking company's insurer, which denied coverage. Although the men were loading the truck and therefore using it, they were not agents or employees of IBM. As a result, the question was not whether the accident occurred during the loading, but whether the injury arose out of IBM's use of the vehicle. (*IBM, supra,* 2 Cal.3d at pp. 1028–1029.) The Supreme Court observed that a shipper may become a user of the truck if its own employees participate in the loading or unloading, or supervise or direct the operation, but that mere maintenance of the premises used for loading did not render the shipper a user of the truck. (*Id.* at pp. 1029–1030.)

[10] In discussing cases supporting its decision that the concept of "use" of a vehicle could not be stretched so far, the Supreme Court referred to a summary of decisions provided in a New Jersey case, which observed that the " 'sounder result favored by most courts is that automobile liability insurance under a loading and unloading clause should not cover damages sustained as a result of negligent maintenance of the premises where the loading or unloading was carried out. The risk insured against should be limited to negligence in loading or unloading the automotive vehicle . . . .' " (*IBM, supra,* 2 Cal.3d at p. 1031, quoting *Atlantic Mut. Ins. Co. v. Richards* (1968) 100 N.J.Super. 180, 185 [241 A.2d 468, 471].)

## DISPOSITION

The judgment is affirmed. The respondents are to recover costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 23, 2005.