[No. H033195. Sixth Dist. Jan. 28, 2010.]

AMERICAN INTERNATIONAL UNDERWRITERS INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v. AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, Defendant, Cross-complainant and Appellant.

COUNSEL

Selman Breitman, Nicholas Banko and James R. Tenero for Defendant, Cross-complainant and Appellant.

McCormick Barstow Sheppard Wayte & Carruth, James P. Wagoner, Jack S. Fischer and Geni K. Krogstad for Plaintiff, Cross-defendant and Respondent.

OPINION

ELIA, J.—After settling an action for personal injury, appellant American Guarantee and Liability Insurance Company (American) and respondent American International Underwriters Insurance Company (AIU) sought indemnification from each other, and each moved for summary judgment. The trial court denied American's motion, granted summary adjudication to AIU, and ultimately entered judgment for AIU. American appeals, contending that the parties responsible for the underlying plaintiff's injuries were not insureds under its liability policy. We agree and therefore must reverse the judgment.

*Background*

A development project in San Jose required the excavation and removal of soil from the construction site, resulting in a series of subcontracting arrangements. O.C. Jones, the excavation contractor on the project, retained Allied Waste Management (Allied) to remove the soil and transport it to Allied's disposal facility. Allied then orally contracted with Denbeste Transportation, Inc. (Denbeste), to perform the hauling. Denbeste, using a written subhaul agreement, subcontracted with Double D Transportation Company (Double D) to assist Denbeste in the job. Double D in turn entered into a separate subhaul agreement with James D. Camara, owner of MJC Trucking. It was undisputed that both Double D and Camara were acting as independent contractors pursuant to their respective agreements.

Under the Denbeste-Double D subhaul agreement, Double D had the right to refuse transportation assignments requested by Denbeste, and Double D was required to maintain its own liability insurance and to make Denbeste an additional insured. Double D was insured under an umbrella policy issued by respondent AIU, while Denbeste was the named insured on two American policies: a comprehensive general liability (CGL) policy (which is not at issue in this appeal) and a commercial auto policy which included a "Trucker Coverage Form" (Trucker policy).

Pursuant to his subcontract with Double D, Camara drove his own MJC tractor connected to a Double D trailer. On October 8, 1999, while Camara

was hauling soil from the project site to the disposal site, the tractor-trailer ran over Christopher Torgerson, severely injuring him. In September 2000 Torgerson brought a negligence action against Camara, Denbeste, Double D, and the general contractor on the development project, among others. Double D and Camara tendered their defense to Denbeste's insurer, American, but American rejected tender on the ground that neither was covered as an insured under the Trucker policy.

In November 2003, Torgerson settled with all defendants for $5.05 million. AIU (Double D's carrier) and American (Denbeste's carrier) each agreed to contribute $1.45 million "on behalf of all of its insureds involved in the Action," while reserving their rights to pursue each other. American thereafter paid $1 million under Denbeste's CGL policy and $450,000 under the Trucker policy. AIU likewise paid the promised amount pursuant to the settlement.[1]

AIU then brought suit against American for equitable contribution, equitable subrogation, equitable indemnity, and declaratory relief. According to AIU, it was an excess insurer, while American was a primary insurer covering Camara and Double D as well as Denbeste. American denied these allegations and filed a cross-complaint, contending that neither Double D nor Camara was an insured under the American policy issued to Denbeste. American also called attention to an indemnity provision in Double D's subhaul agreement with Denbeste.[2] Each party sought recovery of the $1.45 million it had contributed to the settlement.

In January 2008 the parties filed cross-motions for summary judgment or alternatively, summary adjudication with respect to AIU's first amended complaint and American's cross-complaint. American argued that neither Double D nor Camara was an insured under Denbeste's Trucker policy. American maintained that the relationship between Denbeste and Double D was governed by the subhaul agreement and by the "routine contractual commercial relationship between themselves [sic]." That agreement, American noted, required Double D to name Denbeste as an additional insured in its liability policy.

---

[1] Additional contributions were made by the insurers for Allied, the general contractor, O.C. Jones, and Camara.

[2] In this subhaul agreement Double D agreed "to indemnify and hold [Denbeste] free and harmless from all claims, loss and damage on account of injury to or death of persons, or damage to property, caused or alleged to be caused by or in connection with the operation of equipment belonging to or used by Subhauler or drivers engaged or employed by Subhauler, including all claims, loss, pilferage, or damage to equipment and cargo that is in Subhauler's possession or under its dominion or control."

AIU, on the other hand, contended that it had no duty to contribute to the Torgerson settlement because its policy was excess only, and American's primary policy, which had not been exhausted, covered Double D and Camara as well as Denbeste. In AIU's view, the indemnity provision of the subhaul agreement between Denbeste and Double D was inapplicable to the parties' dispute.

The superior court granted AIU's motion as to the complaint and denied American's motion in its entirety. As to American's cross-complaint, the court granted AIU summary adjudication as to all causes of action except the first, for "Subrogation/Equitable Indemnity."[3] At the request of American, the court subsequently clarified its order to articulate specifically its finding that Double D was an insured under the American Trucker policy "as the owner from whom Denbeste Transportation *hired* a covered 'auto' that is a 'trailer.'" In a judgment entered May 29, 2008, the court awarded AIU $1.45 million plus prejudgment interest of $618,136.96 and costs.

### *Discussion*

In moving for summary judgment AIU advanced the theory that it had no duty to contribute to the settlement with Torgerson because its umbrella policy was excess, and the coverage of Denbeste's primary policy had not been exhausted. On appeal, American maintains that AIU "literally [*sic*] puts the cart before the horse," because it was obligated to pay only those amounts the *insured* was liable to pay as damages. Neither Double D nor Camara, American argues, was an insured under the Trucker policy. American further disputes the award of prejudgment interest to AIU. We need not address this second argument because we find merit in the first.

### 1. *Standard of Review*

Summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c,

---

[3] In denying summary adjudication to both parties, the trial court recognized that the parties had improperly requested summary adjudication of issues, which would have been unauthorized as it would not have disposed of "one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty." (Code Civ. Proc., § 437c, subd. (f)(1).) This statutory provision clearly states that "[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1); cf. *Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1095, fn. 2 [86 Cal.Rptr.2d 909].) The court also ruled that AIU had not met its burden to show that one or more elements of American's first cause of action could not be established or that there was a complete defense to that claim.

subd. (c).) The primary issue before us is whether American's policy provisions applied on largely undisputed facts. We independently review the trial court's ruling on this question. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589].)

■ "Insurance contracts are contracts to which the ordinary rules of contract interpretation apply. [Citation.]" (*Allstate Ins. Co. v. Mercury Ins. Co.* (2007) 154 Cal.App.4th 1253, 1258 [65 Cal.Rptr.3d 451].) Those rules "require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) It is the mutual intention of the parties at the time the contract is formed that governs interpretation. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 [50 Cal.Rptr.3d 597, 145 P.3d 472].) Interpretation of policy language is a question of law. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.)

## 2. The Trucker Policy

American's Trucker policy provided $5 million in coverage to Denbeste for liability arising out of property damage or bodily injury resulting from the use of a covered "auto." The term "auto" extended to "ANY 'AUTOS,' " "HIRED 'AUTOS' ONLY," and "NONOWNED 'AUTOS' ONLY." Hired autos were those "you lease, hire, rent or borrow," while nonowned autos were those that the policyholder did not own, lease, hire, rent or borrow, but which "are used in connection with your business." The term "auto" itself was defined to include trailers.

The liability section also identified "Who is an insured" in addition to the policyholder. Among those covered were the following: "b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow . . . . [¶] c. The owner or anyone else from whom you hire or borrow a covered 'auto' that is a 'trailer' while the 'trailer' is connected to another covered 'auto' that is a power unit . . . . [¶] e. Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability." The policy stated that coverage was primary "for any covered 'auto' while hired or borrowed by you and used exclusively in your business as a 'trucker' and pursuant to operating rights granted to you by a public authority."

The point of dispute in this case is whether these provisions covered Camara and Double D on a primary basis, thereby releasing AIU of any obligation to contribute under the umbrella policy issued to Double D. The outcome turns on the meaning of "hired auto" and the intended scope of the phrase "anyone else while using with your permission" that hired auto. If

Denbeste can be said to have *hired* the tractor and trailer and then to have given Camara and Double D permission to use them, then Camara and Double D were insureds under the Trucker policy, and American was required to exhaust its policy limits before AIU's excess provisions came into play.

Civil Code section 1925 defines "hiring" as synonymous with renting—that is, "a contract by which one gives to another the temporary possession and use of property, other than money, for reward, and the latter agrees to return the same to the former at a future time." In *Entremont v. Whitsell* (1939) 13 Cal.2d 290 [89 P.2d 392] (*Entremont*), the Supreme Court applied this section in a dispute over whether a contract to transport materials constituted the rental of equipment or performance of services. Entremont had agreed to "rent" three dump trucks, with drivers, to the Department of Public Works for a highway repair project. Following an investigation into the amounts Entremont was charging for the use of his trucks, the Railroad Commission determined that the contract at issue was for the transportation of materials and thus was governed by its order fixing the minimum rates for such service. The Supreme Court agreed. Although the contract purported to provide for a rental, it was "denominated by the parties as a 'Service Agreement', was for the transportation of property by motor vehicle, and was not for the renting or leasing of tools or equipment." (*Id.* at p. 294.) The court reasoned that "under the contract the possession and control of the trucks and the operators thereof did not pass to the department—the operators did not become the employees of the department—but such possession and control remained in Entremont. The chief characteristic of a renting or a leasing is the giving up of possession to the hirer, so that the hirer and not the owner uses and controls the rented property. (Civ. Code, [§§] 1925, 1955.) The record is clear that the only supervision exercised by the department over the operators of the trucks was to direct them where to load and unload the material hauled, when to go on or leave the job, and to inform the operators whether the load should be dumped or spread. The department had no power to discharge the drivers—that power, and the power of selection, rested in Entremont. That is a factor of some importance in ascertaining whether Entremont or the department controlled the operators. [Citation.] Moreover, the provisions of the contract indicate that it was not the intention of the parties that the department should exercise exclusive control over the operators. The contract required Entremont to keep the trucks in repair; to pay all expenses incidental thereto; to supply all oil, gas and other materials necessary for their operation; to carry compensation insurance on the drivers, and expressly provided the operators were the employees of Entremont. Further, under the contract, Entremont assumed all responsibility for damage or injury to other persons or property by reason of the operation of the trucks. This provision strongly implies that exclusive control was not conferred on the department." (*Id.* at pp. 295–296.) The court thus concluded that "the

transaction lacks that element of a transfer of use and possession of property to the hirer which is essential to the existence of a leasing." (*Id.* at p. 297.)

The Third District followed *Entremont*, again citing Civil Code section 1925, in *Rice Bros., Inc. v. Glens Falls Indem. Co.* (1953) 121 Cal.App.2d 206 [263 P.2d 39] (*Rice Brothers*). An employee of Rice Brothers, the insured, had damaged the truck of Holloway, a trucking company with which Rice Brothers had contracted to provide additional dump trucks for a paving job. The insurer of Rice Brothers denied liability coverage under a clause excluding damage of property " 'owned by, rented to, in charge of, or transported by the insured.' " (*Id.* at p. 207.) The trial court examined the oral contract between Rice Brothers and Holloway and impliedly found that Rice Brothers had not rented the damaged truck, nor was it "in charge of" it or transporting it at the time of the accident. (*Id.* at p. 209.) After judgment was entered for Rice Brothers, the insurer appealed, challenging the trial court's factual findings that Holloway's trucks had not been "hired." The appellate court upheld that finding as supported by substantial evidence. Holloway had not only provided the additional trucks, but had also provided the drivers, paid for fuel and maintenance of the trucks, and paid the drivers' wages. The contract had not given Rice Brothers either possession or control of the truck at any time. On the contrary, while the Rice Brothers drivers were under the company's complete control, Holloway's drivers were not. Holloway "could do anything he wanted with his trucks at any time he wanted to," though payment was contingent on performing the work required by the contract. (*Id.* at p. 208.)

As in *Entremont* and *Rice Brothers*, the contract before us provides for transportation of property by motor vehicle, not for the renting of trucks and trailers by Denbeste. The subhaul agreement identifies Double D as an independent contractor "that agrees to transport shipment for tools or equipment for Prime Carrier [Denbeste]." The subject of the contract was repeatedly referred to in the document as the "performance of Subhaul services," not the provision of equipment for Denbeste's use. Double D, like Entremont and Holloway, was required to maintain the equipment at its own expense and to pay its drivers' salaries and worker's compensation insurance.[4] And while Denbeste could use any other subhauler's services, it had "no power to discharge the drivers"; at best its principal could report the driver to the O.C. Jones superintendent for possible "release" from the job. (*Entremont, supra,* 13 Cal.2d at p. 295.) Likewise, while hauling for Double D, Camara remained responsible for repairing and operating his own vehicle; he testified, "[n]obody tells me how to drive my truck." Thus, we regard the arrangement between Denbeste and Double D as comparable to those discussed in *Entremont* and *Rice Brothers*. As in those cases, possession and control of

---

[4] Likewise, Camara was responsible for maintaining his own vehicle.

Camara or the equipment he was operating did not pass to Denbeste. (*Entremont, supra,* 13 Cal.2d at p. 295; *Rice Brothers, supra,* 121 Cal.App.2d at p. 209.)

 Another analogous situation was presented in *Northbrook Excess & Surplus Ins. Co. v. Coastal Rescue Systems Corp.* (1986) 182 Cal.App.3d 763 [227 Cal.Rptr. 639] (*Coastal Rescue*), where the activity of a rescue training company (Coastal Rescue) did not fall within a policy exclusion for injury arising out of the operation or use of an aircraft "owned or operated by or rented or loaned to any insured." (*Id.* at p. 767, italics omitted.) Coastal Rescue was engaged in a rescue teaching exercise with the use of a helicopter provided by Spirit Airways. During the exercise, the helicopter lost altitude and two students were injured. Reversing the trial court's judgment, the First District, Division 3, held Northbrook, Coastal Rescue's insurer, liable for coverage under its CGL policy. The court recognized the use of the word "possession" in the Civil Code definition of "hired," and it acknowledged the holdings of *Rice Brothers* and *Entremont* in concluding that "one of the determinative factors in deciding whether there is a rental agreement is whether the person engaging the services of the operator and the vehicle has possession and control of the vehicle." (*Id.* at p. 768.) Coastal Rescue had neither possession of the helicopter nor control over the performance of the Spirit Airways pilot. Because no delivery of possession and use had occurred, there had been no rental or loan of the helicopter from Spirit Airways to Coastal Rescue. (*Id.* at p. 769.)

As in *Coastal Rescue,* here Denbeste engaged the transport services of Double D without assuming possession or exercising control over Double D's trailer or Camara's tractor. Clearly, the relationship between Denbeste and Double D involved a relationship between a prime carrier and a subhauler acting as an independent contractor, which did not relinquish possession and control of its equipment to Denbeste. Camara likewise was operating his own tractor and a trailer leased from Double D, pursuant to his subhaul agreement with Double D.

Both parties recognize the relevance of a related term, "borrow," to the interpretation of "hire." In *Home Indemnity Co. v. King* (1983) 34 Cal.3d 803 [195 Cal.Rptr. 686, 670 P.2d 340] (*King*), Martin, a forklift operator, injured the driver of a truck insured by Home Indemnity. One of the issues was whether Martin was insured as a "borrower" of the truck under Home Indemnity's policy. The Supreme Court, noting that the term "borrower" was not defined in the policy, adopted definitions from a dictionary and a decision from another state: "The term 'borrow' has been defined as: 'To receive temporarily from another, implying or expressing the intention either of returning the thing received or of giving its equivalent to the lender.'

(Webster's New Internat. Dict. (3d ed. 1961).) In a case involving a similar situation, a borrower was defined as someone who, with the permission of the owner, has temporary possession and use of the property for his own purposes; possession connotes the right to exercise dominion and control. (*Liberty Mut. Ins. Co. v. Am. Emp. Ins. Co.* (Tex. 1977) 556 S.W.2d 242, 244–245 [evidence insufficient to support finding that forklift operator unloading goods from a truck was a 'borrower' of the truck].)" (*King, supra*, 34 Cal.3d at p. 813.) In holding that Martin was not a borrower, the Supreme Court emphasized that he had not had dominion and control of the truck or the trailer on which he was loading cargo: "The only evidence of dominion and control comes from this implied contractual obligation of good faith and fair dealing. There was no evidence that Martin either moved the rig or had express authority to do so. Nor, for that matter, was there any evidence of the authority of forklift operators generally with respect to vehicles being loaded or unloaded. We find the evidence insufficient to show that Martin exercised the requisite dominion and control over the truck and trailer to be a 'borrower' under the terms of the policy." (*Id.* at pp. 813–814.)

Two other appellate decisions are instructive in the circumstances presented here. In *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154 [286 Cal.Rptr. 146] (*Fireman's Fund*), the Third District revisited the question of "Who is Insured" in circumstances similar to those before us. There a tractor-trailer rig collided with a car occupied by the plaintiffs in the underlying lawsuit. Subcarrier Richardson Trucking owned the tractor, and shipper Spring Air Mattress owned the trailer. Richardson Trucking was held to have an extant policy issued by Fireman's Fund. Fireman's Fund, however, contended that the tractor rig was a "hired vehicle" under two policies issued to the carrier, Better Home Deliveries (along with its parent company, Leaseway Transportation), due to the "subhaul relationship" between the carrier and Richardson Trucking. (*Id.* at p. 1168.)

The appellate court agreed with the trial court's finding that Richardson Trucking was not an insured under the carrier's Allstate policy, which covered the carrier (as the named insured) and "[a]nyone else . . . while using with *your* permission a covered *auto you* own, hire or borrow." (*Fireman's Fund, supra*, 234 Cal.App.3d at p. 1170.) It was unreasonable to suggest that Richardson Trucking was using its own vehicle with the carrier's permission; such an interpretation " 'would strain the plain meaning of the words and be contrary to the construction given similar terms in the authorities cited.' " (*Id.* at p. 1168.)

The provision in the Trucker policy likewise offered coverage for Denbeste or "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow." As in *Fireman's Fund*, it would be unreasonable to infer that

this provision contemplated Denbeste's granting *permission* to Double D and Camara to use *their own* vehicles in their business with Denbeste.

*City of Los Angeles v. Allianz Ins. Co.* (2005) 125 Cal.App.4th 287 [22 Cal.Rptr.3d 716] (*Allianz*) reinforces and explains the requirement that dominion and control be imparted to the hirer to meet the conditions of a policy covering insureds who "hire or borrow" the vehicle of another. There the city had contracted with a composting company to purchase and remove biosolids from the city's sewage treatment plant, and the composting company had then subcontracted the job to a trucking company. After the material was loaded onto his truck for weighing at the plant, the truck driver was injured. The trucking company's insurers refused to defend the city against the driver's lawsuit, and the city was found liable. In the ensuing suit by the city against the insurers, the coverage issue was whether the city had "borrowed" the truck when it was loaded with sewage and then weighed. The policy protected a " 'lessee or borrower or any of their employees, while moving property to or from a covered auto.' " (*Id.* at p. 290.) Citing *King*, the appellate court emphasized that "one point is beyond dispute: the exercise of 'dominion and control over the truck' is indispensable to a finding that the City was a 'borrower' of [the trucking company's] truck under the terms of the insurance policy." (*Id.* at p. 292.)

The court upheld the trial court's factual finding that dominion and control were insufficiently established to constitute a borrowing of the truck. It agreed with the trial court that borrowing entails temporary possession, which in turn " 'connotes the right to exercise dominion and control.' " (*Allianz, supra*, 125 Cal.App.4th at p. 292.) The city's assertion that it was a *user* of the truck while the loading occurred was unavailing, because use is not invariably equivalent to borrowing; as the court pointed out, one can " 'use' . . . a truck one does not own and has not borrowed or hired." (*Ibid.*)

AIU maintains that even if dominion and control are required in order to be denominated an insured hirer or borrower of a covered auto, that element was established by Denbeste's control over the route. AIU specifically calls attention to Joseph Denbeste's oral warnings to drivers to stay on the prescribed route and his presence at the exit gate, "where he stopped and logged each truck, directed each driver to complete the trip manifests and confirmed tarping."

AIU overstates Joseph Denbeste's control. He explained in his deposition that it was the project superintendent, an employee of the excavation contractor, who designated the route and even directed Joseph Denbeste in his duties, including that of taking a position at the exit gate. As noted earlier, Joseph Denbeste did not have the authority to fire Camara; he could only warn Camara that if he learned that Camara had left the designated route a second time, he would "turn him over" to the project superintendent.

*Allianz* is again noteworthy on this point. There the city unsuccessfully argued that its supervision over the loading process was sufficient to establish its role as a borrower of the truck. The city had maintained the pickup site, provided the loading procedures, directed the hauler along the required route, instructed the hauler on the proper positioning of the tractor-trailer rig to receive and weigh the load, supervised the weighing of the trailer before and after loading, and inspected the load for cleanliness and adequate tarping before the truck left. The driver, while following those instructions, nevertheless "maintained control over his truck at all times during the loading operation" and was only performing his duties under his hauling contract in furtherance of his company's commercial purposes. (*Allianz, supra*, 125 Cal.App.4th at pp. 291, 293.) Thus, as in *King*, the requisite dominion and control by the city over the subhauler's truck did not exist.

■ In the court below and on appeal, AIU has relied on a definition of "hired auto" derived from cases such as *Monolith Portland Cement Co. v. American Home Assur. Co.* (1969) 273 Cal.App.2d 115 [78 Cal.Rptr. 113] (*Monolith*), *Fratis v. Fireman's Fund American Ins. Companies* (1976) 56 Cal.App.3d 339 [128 Cal.Rptr. 391] (*Fratis*), and *Continental Cas. Co. v. Zurich Ins. Co.* (1961) 57 Cal.2d 27 [17 Cal.Rptr. 12, 366 P.2d 455] (*Zurich*). Their holdings do not compel a result in AIU's favor. In each case the reviewing court had before it a policy provision expressly defining "hired automobile" as a nonowned automobile " 'used under contract in behalf of [or "under contract with"] . . . the named insured . . . .' " (*Monolith, supra*, 273 Cal.App.2d at p. 118; *Fratis, supra*, 56 Cal.App.3d at p. 342; see *Zurich, supra*, 57 Cal.2d at p. 32.) Here, by contrast, the American policy contains no such broad definition. " 'We may not . . . rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid.' " (*Fireman's Fund, supra*, 234 Cal.App.3d at p. 1169.) Accordingly, we decline AIU's invitation to "read into" the Trucker policy a meaning drawn from contract provisions that are not before us. Instead of redefining the insurer-insured relationship by inserting words into the American insurance policy, we resort to Civil Code section 1925, which makes "hired" equivalent to "rented" and requires temporary possession of the property.

In *Travelers Indemnity Co. v. Swearinger* (1985) 169 Cal.App.3d 779 [214 Cal.Rptr. 383] (*Swearinger*)—the primary decision on which AIU continues to rely—again the issue was the meaning of "borrow," a term not defined in the policy under scrutiny. A student in the Fall River school district was driving her father's car during a school-sponsored activity when she was involved in an accident that injured her passenger, plaintiff Swearinger. The court held that the young driver was an insured under the school district's liability policy because the district had "borrowed" her father's car within the meaning of the "Who is Insured" provision which stated, " 'Anyone else is an *insured* while using with *your* [i.e., the school district's] permission a covered

*auto you* own, hire or borrow . . . .' " (*Swearinger, supra*, 169 Cal.App.3d at p. 783.) The court rejected the insurer's argument that borrowing requires dominion and control, which in turn implies physical possession of the vehicle. Instead, it defined "borrow" as " 'to make temporary use of (something not one's own).' " (*Id*. at p. 785.) Given this broad meaning, the school district had *borrowed* the car from the driver's father.

In dictum, the *Swearinger* court noted the term "hire," with which "borrow" had a "natural affinity," and which differed from "borrow" only in that it involved monetary compensation. (*Swearinger, supra*, 169 Cal.App.3d at p. 785.) "Hire," the court suggested, "is used in a sense which excludes physical possession altogether when remuneration is involved. We say, for example, that one hires a taxicab, even though the taxicab owner drives it." (*Ibid*.) The court also pointed to definitions of "hired automobile" used in other policies, citing *Fratis* and *Monolith*—that is, "one used under contract in behalf of, or loaned to, the named insured." (*Id*. at p. 786.)

In our view, the *Swearinger* decision is based on an inadequate definition of "borrow," and thus misdirected the trial court here in its application of the related term "hired auto." While citing the rule that terms must be used in their ordinary and popular sense, the court deviated from that principle and appeared to invoke another rule, that uncertainties in insurance contracts are resolved against the insurer. This was an incomplete statement of the law. The purpose of the resolution of uncertainty in favor of the insured is to protect his or her *reasonable* expectation of coverage. (*Power Fabricating, Inc. v. State Comp. Ins. Fund* (2008) 167 Cal.App.4th 1446, 1451 [84 Cal.Rptr.3d 770].) " '[T]his rule of construction is applicable only when the policy language is found to be unclear.' " (*Ibid*.) "A policy provision is ambiguous only when it is capable of two or more constructions, *both* of which are reasonable." (*Amex Assurance Co. v. Allstate Ins. Co.* (2003) 112 Cal.App.4th 1246, 1251 [5 Cal.Rptr.3d 744], italics added.) " ' "An insurance policy is not rendered ambiguous or uncertain . . . because of a strained or grammatically incorrect reading of the policy's terms. [Citation.] 'Although we construe all provisions, conditions, or exceptions that tend to limit liability strictly against the insurer . . . strict construction does not mean strained construction.' " ' " (*Fireman's Fund, supra*, 234 Cal.App.3d at p. 1169, citation omitted.) Accordingly, even when resolving uncertainties and ambiguities against the insurer, "the policy must be given a reasonable interpretation and the words used are to be given their common, ordinary and customary meaning." (*United Services Automobile Assn. v. Warner* (1976) 64 Cal.App.3d 957, 962 [135 Cal.Rptr. 34].) Supplying a definition of "hired automobile" found in insurance policies from other cases is, in our view, improper.

Further, the *Swearinger* opinion selectively illustrates "hire" with the taxicab scenario, without recognizing the more common situation in which one hires—i.e., rents—a vehicle for his or her own use by taking temporary *possession* of the vehicle in exchange for money. The inductive inference that a hiring necessarily "excludes physical possession altogether when remuneration is involved" is contrary to logic and the reality of everyday transactions involving vehicles. Also overlooked is the inclusion of the words "temporary possession" in the Civil Code definition of "hired." (See also *Coastal Rescue, supra,* 182 Cal.App.3d at p. 768 ["one of the determinative factors in deciding whether there is a rental agreement is whether the person engaging the services of the operator and the vehicle has possession and control of the vehicle"].)

Moreover, we believe that the *Swearinger* court inadequately distinguished the facts in *King* and mischaracterized the Supreme Court's holding in that case: "The Supreme Court held that Martin had not borrowed the tractor [*sic*] because there was no evidence he moved it or had express or implied authority to do so. . . . Martin made no use of the tractor [*sic*] nor was such use part of his agreement with King. By contrast Fall River did use the Gallion automobile for its purpose in transporting guest students." (*Swearinger, supra,* 169 Cal.App.3d at pp. 787–788, citation omitted.) Missing from this account of *King* is the Supreme Court's emphasis on the absence of evidence "that Martin exercised the requisite dominion and control over the truck and trailer to be a 'borrower' under the terms of the policy." (*King, supra,* 34 Cal.3d at pp. 813–814.) The *Swearinger* court did not even mention either *Rice Brothers*, a decision from that district, or the Supreme Court's opinion in *Entremont.*

We therefore decline to adopt the *Swearinger* view of "borrow" and the related term "hire." As explained by the high court of a sister state, "The idea of *borrowing* in general, and of *borrowing a motor vehicle* in particular, simply does not encompass, within the generally prevailing meaning of the term, every instance in which a policy holder may have received a benefit from the use of an auto by another. [¶] . . . [¶] The majority of other courts . . . have also concluded that the term *borrow* connotes much more than merely receiving some benefit from another's use of a third person's vehicle. They have determined that borrowing a car requires possession reflecting dominion and control over the vehicle." (*Schroeder v. Board of Supervisors of Louisiana State University* (La. 1991) 591 So.2d 342, 346–347.) In contrast to the holding of *Swearinger*, the *Schroeder* court concluded that the defendant university (the named insured) had not "borrowed" the car involved in an accident on a school-related errand, because it "did not possess, dominate, control or acquire the right to direct the use of the vehicle . . . ." (591 So.2d. at p. 343; cf. *American Economy Ins. Co. v.*

*Thompson* (Ala. 1994) 643 So.2d 1350, 1355 [driver's employer had dominion and control over van while use of van was for employer's business purpose].) At the very least, the circumstance that seems to have partially driven the result in *Swearinger*—that a school district can operate only through individuals—is not present in the case before us, and thus does not support expansion of the scope of the coverage provision for borrowing and hiring.

■ We thus conclude that the trial court erred in ruling that as a matter of law the Trucker policy issued to Denbeste covered Double D "as the owner from whom Denbeste *hired* a covered 'auto' that is a 'trailer.' " AIU produced no facts indicating Denbeste's assumption of possession or control of the tractor or the trailer; nor can we endorse AIU's corollary theory that Camara was "using" his own tractor and Double D's trailer with the permission of Denbeste as the hirer or borrower of those vehicles. (Cf. *Fireman's Fund*, *supra*, 234 Cal.App.3d at p. 1172 [trial court properly rejected insurer's strained theory that carrier had granted Richardson Trucking permission to use its own fully insured vehicle].) Instead, Denbeste engaged Double D as an independent contractor for hauling services, which Double D then subcontracted to Camara. Because Denbeste cannot be said to have "hired" the vehicles involved in the accident merely by retaining Double D to transport the soil, AIU did not establish that Double D was insured by American. AIU therefore was not entitled to summary adjudication of any of the causes of action in either its complaint or American's cross-complaint.

Our conclusion further affects American's motion for summary judgment, which the trial court denied on the ground that Double D and Camara were insured by American. By demonstrating that Double D was not covered under the Trucker policy issued to Denbeste, American met its initial burden to show that it was entitled to judgment as a matter of law. In accordance with summary judgment procedure, the burden then shifted to AIU to make a prima facie showing that there existed a triable issue of material fact. AIU, however, made only a brief suggestion in the conclusion to its opposing brief below that "whether Denbeste exercised sufficient control over the vehicles is a question of fact." The focus of its argument was that the Trucker policy offered coverage as a matter of law, whether or not dominion and control were necessary to meet the definition of "hired." On appeal, AIU adheres to this position without renewing its suggestion that a disputed question of fact existed on the extent of its control over the tractor and trailer. Even if this argument had been presented to us, we would nonetheless determine that in light of the authorities discussed, no triable issue of material fact was manifested by AIU's opposition to American's motion, because the undisputed facts established Denbeste's lack of possession and control.

*Disposition*

The judgment is reversed. The trial court is directed to vacate its order granting summary adjudication to AIU and denying summary judgment to American, and to enter a new order granting American's motion and denying that of AIU. American is entitled to its costs on appeal.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied February 25, 2010, and respondent's petition for review by the Supreme Court was denied April 14, 2010, S180865. George, C. J., and Corrigan, J., did not participate therein.