AMERICAN FIDELITY & CASUALTY CO.
et al. v. PENNSYLVANIA
CASUALTY CO. et al.

Civ. No. 691.

United States District Court.
E. D. Tennessee, S. D.

May 25, 1950.

966

Strang, Fletcher & Carriger, Chattanooga, Tenn., for plaintiffs, American Fidelity & Casualty Co. and Capital Motor Lines.

Charles A. Noone, Chattanooga, Tenn., for defendant Pennsylvania Casualty Co.

Harry J. Schaeffer, Chattanooga, Tenn., for defendants J. B. Levan and Florence Levan, d/b/a Cherokee Motor Coach Co.

DARR, Chief Judge.

This case was tried to the Court without a jury and resulted in a judgment in favor of the defendants. The plaintiffs have filed a motion for a new trial.

A full and careful examination of the perplexing questions presented results in the Court directing vacation of the judgment heretofore entered and an award as herein indicated.

For adjustment are claims paid by plaintiffs and defendants to passengers who were injured in a bus accident, on November 16, 1943, on the highway between Jasper, Tennessee, and Chattanooga, Tennessee.

On and before this date Capital Motor Lines, hereinafter called Capital, had a contract with the United States Govern-

ment to transport to military induction centers persons selected in this area under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq.

The Cherokee Motor Coach Company, hereinafter called Cherokee, as well as Capital, operated a cross-country bus service. Just prior to the date mentioned Capital had orders from the Government to transport a number of selectees from South Pittsburg, Tennessee, to Fort Oglethorpe, Georgia. On the date designated for the journey Capital found that it had no available bus. Thereupon John T. Grissom, a representative of Capital, entered into an agreement with Cherokee whereby Capital was to obtain a bus and driver from Cherokee, for which Cherokee was to receive compensation.

The arrangement as made for the use of Cherokee's bus was not in writing and did not specify who would pay the cost of, or insure, the operations, or what were otherwise the terms on which the bus was to be used. The amount of compensation was not agreed upon or mentioned, but was implied and understood by both parties to be in accordance with a general, informal arrangement, established by the customary compensation paid in other like situations. Both Cherokee and Capital were accustomed to obtain from one or the other a bus in like manner when necessary. On such previous occasions no special arrangements for insurance coverage were made.

The driver of the bus, Vincent A. Messer, was instructed by the Dispatcher for Cherokee to report to Grissom. Messer did so and was instructed by Grissom to report to a driver of Capital, to use the bus on the out trip to transport passengers who could not be accommodated on the Capital regular run, and on his return to convey the selectees from South Pittsburg.

The Cherokee bus did have some passengers on the out trip. At South Pittsburg Messer reported to a driver of Capital. Messer received instructions about picking up the selectees and also was given a regular Capital ticket indicating the number of persons to be transported and their right for passage. He was also informed that a part of his duties was to pick up more selectees in Jasper.

In accord with the instructions the selectees at South Pittsburg were placed on board the bus which proceeded to Jasper where other selectees were picked up. Thereafter the bus was continuing on its way to Chattanooga when the accident occurred.

Pennsylvania Casualty Company, a defendant, hereinafter called Pennsylvania, was insurance carrier for Cherokee. American Fidelity & Casualty Company, hereinafter called American, was insurer for Capital.

The insurance premiums on policies of both carriers were based on gross revenue.

All claims of injured persons arising out of the accident have been paid by either the plaintiffs or by the defendants. Stipulations have been entered into by the parties agreeing to these payments. There is no question as to the amount or validity of the claims paid.

The stipulations also provide that all questions as to primary insurance, excess insurance, and all the rights of the parties with respect to such matters should remain open for settlement and that none of the parties should be prejudiced by any payment of claims arising out of the accident.

The question of negligence or the cause of the accident is not raised. All parties have agreed that the accident was one in which the injured selectees were entitled to recover damages.

Both policies of insurance have the general coverage usually found in automobile liability policies. Particularly for consideration is the following clause in the policy issued by Pennsylvania to Cherokee:

"III Definition of 'Insured'

"The unqualified word 'insured' wherever used in coverages A and B and in other parts of this policy, when applicable to such coverages, includes the named insured and, except where specifically stated to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the

automobile is with the permission of the named insured * * *";

and the following provisions in the Hired Car and Gross Receipts Endorsement of the policy issued by American to Capital:

"1. In consideration of a premium paid by the Assured after being computed at a rate of $3.46 per one hundred dollars of Gross Receipts, it is hereby understood and agreed that the protection afforded by the policy to which this endorsement is attached is extended to cover all equipment owned and hired by the named Assured for the purposes set forth in Statement VIII, when such owned and hired equipment is being operated in the interest of the named Assured.

\* \* \* \* \* \*

"4. It is further understood and agreed, subject to the conditions of the previous paragraph, that should any other like, valid and collectible insurance issued in the name of the owner or lessor or in favor of the named Assured herein, exist, this policy becomes excess over and above such valid and collectible insurance."

The plaintiffs contend that the bus was being operated by Cherokee as an independent contractor and therefore full liability is upon Cherokee and its insurer. Plaintiffs further contend that if Capital is liable under any theory, the liability would only extend to the excess over and above Pennsylvania's insurance.

The defendants contend that Capital hired the bus and driver from Cherokee and that both were under the direction and control of Capital. That under such circumstances Cherokee would not be liable and neither would Pennsylvania under the terms of its policy contract. The defendants claim that American is liable to the extent of its coverage to Capital under the Hired Car Endorsement clause of its policy.

The plaintiffs' motion for a new trial specifies numerous grounds which fall into two general groups and raise essentially two questions.

First, it is urged that the Court erred in holding that Cherokee was not liable to the passengers on the bus for the injuries sustained; that Cherokee was not responsible for the acts of the bus driver; and that Cherokee was not using the bus under an independent contract with Capital so as to relieve Capital of responsibility.

These grounds of the motion are without merit.

The contract of carriage was made with Capital and that company issued tickets to the passengers. Capital had a permit to service the town of South Pittsburg and Cherokee had no such permit. The bus was rented by Capital from Cherokee for Capital's use on the particular trip. Capital was, therefore, undoubtedly liable to the passengers. Cherokee could not lawfully operate the bus on this trip. Johnson Transfer & Freight Lines v. American National Fire Insurance Co., 168 Tenn. 514, 522, 79 S.W.2d 587, 99 A.L.R. 277.

The bus driver, though employed generally by Cherokee, was the servant of Capital for this trip. Denton v. Yazoo, & Mississippi Valley R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; Gaston v. Sharpe, 179 Tenn. 609, 168 S.W.2d 784.

As the obligation to transport the passengers was upon Capital, Cherokee could not be an independent contractor. The obligations of a common carrier to its passengers are non-delegable. Venuto v. Robinson, 3 Cir., 118 F.2d 679, certiorari denied C. A. Ross v. Venuto, 314 U.S. 627, 62 S. Ct. 58, 86 L.Ed. 504; Jenkins v. General Cab Co., 175 Tenn. 409, 135 S.W.2d 448; Hodges v. Johnson, D.C., 52 F.Supp. 488.

The second ground of the motion is that the Court erred in ruling that Capital was not operating the bus with the permission of Cherokee and was, therefore, not an additional insured under the policy issued by Pennsylvania.

This involves an interpretation of the definition of the word "insured" as contained in paragraph III of the policy agreements in the Pennsylvania policy, quoted supra.

Upon a re-examination of these provisions and of the controlling authorities, the Court is of the opinion that this ground of the motion should be sustained.

The question turns upon the meaning of the phrase "with the permission of the named insured".

Permission in such a case is treated as being "consent, expressed or implied". Traders & General Insurance Co. v. Powell, 8 Cir., 177 F.2d 660, 663.

In Stovall v. New York Indemnity Co., 157 Tenn. 301, 8 S.W.2d 473, 477, 72 A.L. R. 1368, the Supreme Court of Tennessee said, "It is our opinion that the words, 'providing such use or operation is with the permission of the named assured,' were intended to exclude from the protection of the policy a person who should take the automobile and use it without permission or authority in the first instance."

It is insisted by the defendants that the word "permission" does not contemplate a "contract", and that permissive use is not intended to mean a use under contract.

This, however, is not sustained by the authorities.

■ Words used in a contract of insurance must be interpreted, like other contracts, according to the ordinary, natural, popular sense and meaning of the terms. Aschenbrenner v. United States Fidelity & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 52 S.Ct. 230, 76 L.Ed. 416; Delaware Insurance Co. of Philadelphia v. Greer, 8 Cir., 120 F. 916; Moore v. Life & Casualty Insurance Co., 162 Tenn. 682, 40 S.W.2d 403.

■ The interpretation of the clause referred to and the effect of this "omnibus" (extended coverage) clause in the policy must, however, be construed in the light of the interpretations of the Tennessee courts. Preferred Accident Ins. Co. v. Barker, 6 Cir., 104 F.2d 424, approving Stovall v. New York Indemnity Co., supra.

In Associated Indemnity Co. v. McAlexander, 168 Tenn. 424, 79 S.W.2d 556, the Supreme Court of Tennessee held that a similar clause of extended coverage protected a third person whose use was for a consideration and pursuant to a contract with the named insured. The contract in that case was more definite and specific than in the present case. The pertinent fact found by the Court of Appeals was as follows: "* * * and defendant Phillips-Buttorff Mfg. Co. not only did not control and direct its use after business hours, but *hold no right to control and direct the manner and place of its use* or storage except during business hours." (Emphasis added.) Phillips-Buttorff Mfg. Co. v. McAlexander, 15 Tenn.App. 618, 625, certiorari denied March 18, 1933.

In the above case the *named insured* was held *not* liable in damages, and judgment was rendered only against McQueen, the person using the car *under contract,* which the court in Associated Indemnity Co. v. McAlexander, supra, held was a "permissive use" under the extended coverage clause.

The recent case of Royal Indemnity Co. v. Markley, 116 Colo. 84, 178 P.2d 672, Supreme Court of Colorado, is identical in principle with the present case. It was there held that a truck held and used under a written lease from the named insured was within the protection of a similar policy provision for extended coverage.

■ Therefore Capital would be an additional insured under the Pennsylvania policy.

That the insurance carriers intended their respective policies to continue coverage in such circumstances is evidenced by the fact that both policies carry endorsements which provide coverage for "extra or hired equipment that might be needed in the operation of the assured's business" (Pennsylvania policy) and "on equipment owned and hired by the named insured * * when operated in the interest of the named insured". (American policy.)

The question next arises as to the extent of Pennsylvania's liability under this extended coverage.

The basic limits under that policy are $5000.00 for each person and $10,000.00 for multiple injuries. By an endorsement attached on July 3, 1943, the limit for multiple injuries was increased by a sliding scale to a maximum of $50,000.00, where there was a seating capacity of thirty-one or more passengers.

This endorsement was attached for the purpose of enabling Cherokee to obtain from the Interstate Commerce Commission a certificate of public convenience and ne-

cessity under the provisions of the Federal Motor Carrier Act. 49 U.S.C.A. §§ 303–327.

The pertinent language of the endorsement is as follows:

"Endorsement for Motor Carrier Policies of Insurance for Bodily Injury Liability, and Property Damage Liability, Under Section 215, of the Interstate Commerce Act

"The policy to which this endorsement is attached is an automobile bodily injury liability and property damage liability policy, and is hereby amended to assure compliance by the insured, as a motor carrier of passengers or property, with section 215 of the Interstate Commerce Act, and the pertinent rules and regulations of the Interstate Commerce Commission.

"In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay any final judgment recovered against the insured for bodily injury to or the death of any person or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and loss of or damage to property of the insured, and property transported by the insured, designated as cargo), resulting from the negligent operation, maintenance, or use of motor vehicles under certificate of public convenience and necessity or permit issued to the insured by the Interstate Commerce Commission, or otherwise under the Interstate Commerce Act, within the limits of liability hereinafter provided, regardless of whether such motor vehicles are specifically described in the policy or not. It is understood and agreed that upon failure of the Company to pay any such final judgment recovered against the insured, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment. The bankruptcy or insolvency of the insured shall not relieve the Company of any of its obligations hereunder. The liability of the Company extends to such losses, damages, injuries or deaths whether occurring on the route or in the territory authorized to be served by the insured or elsewhere, except as follows: No exceptions."

Following the schedule of limits set out in the endorsement it is provided: "The insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement."

It will be observed that this endorsement in several places uses the word "insured", and the meaning of the word "insured" in this connection is important in determining whether limits of liability in this endorsement are applicable in the present case. In other words, does "insured" here have the same meaning as defined in the extended coverage clause above discussed.

To reach a proper interpretation it is necessary to construe the endorsement in the light of the provisions of the Federal Motor Carrier Act.

The Act, 49 U.S.C.A. § 315, provides that "No * * * permit shall be issued to a motor carrier * * * unless such carrier complies with such reasonable rules and regulations * * * governing the filing and approval of surety bonds, policies of insurance * * * conditioned to pay * * * any final judgment recovered against such motor carrier * * * resulting from the negligent operation * * * or use of motor vehicles under such certificate or permit".

It is thus provided that the insurance required shall in terms cover the "motor carrier" which obtains the permit, and such insurance shall be conditioned to pay any judgment recovered against "such motor carrier" resulting from the negligent operation or use of motor vehicles "under such certificate or permit".

In translating or integrating the provisions of the Act into the language of the endorsement on the policy, it is evident that the words "motor carrier" as found in the Act were paraphrased in the policy to the word "insured", that being the appropriate

insurance term, and the "insured" was intended to mean the motor carrier operating the vehicle under the particular permit with respect to which the insurance coverage was provided.

In other words, where insurance was taken, as here, for the purpose of obtaining a permit or certificate of public convenience and necessity under the Act, the provisions of the Act enter into and become a part of the policy of insurance; and such statutory provisions override and supersede anything in the policy repugnant to such provisions. Johnson Transfer & Freight Lines v. American National Fire Ins. Co., supra. Cf. U. S. Fidelity & G. Co. v. Guenther, 281 U.S. 34, 50 S.Ct. 165, 74 L.Ed. 683.

The word "insured" in this endorsement must, therefore, be interpreted to mean the "motor carrier" operating the vehicle under the permit with respect to which the insurance was provided and not the meaning given under the extended coverage clause.

Moreover, without regard to the definition of the word "insured" in the endorsement, the coverage is limited to the provisions of the endorsement even though in conflict with other parts of the policy. Under the endorsement there arises no liability unless the vehicle is being operated under the permit issued to the named insured motor carrier.

Inasmuch as the bus, in this case, was being operated under Capital's permit and not under the permit of Cherokee the increased liability under this endorsement would not be applicable and the original policy limit will prevail.

This endorsement would not have the effect of abrogating or superseding the original policy limits as the endorsement expressly provides for reimbursement to the insurer "* * * *for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement."* (Emphasis added.) Clearly the endorsement contemplates that the original policy limits would remain in force.

To the extent reflected, the motion for a new trial is granted and a judgment awarded.

Pennsylvania's liability under its policy shall be limited to $10,000.00, together with attorneys' fees, court costs and any other expenses properly incident to such liability, and the remainder of the loss shall be borne by American up to its policy limits.

Findings of fact and conclusions of law in conformity herewith will be prepared and filed by the Court.

### Memorandum in Settlement of Judgment and Findings of Fact and Conclusions of Law

On February 8, 1950, the Court filed a memorandum outlining the general rules affecting the liability of the parties, but counsel differ as to the money judgment which properly conforms to the Court's opinion. The difficulty is in allocating the losses in view of the insurance policy limits, the absence of proof showing the cause of the accident and the intention of the parties as contained in the written stipulations.

The record discloses merely that there was an accident in transporting Capital's passengers in a bus which Capital leased or rented from Cherokee, with no express contract for the lease or rental or for insurance protection.

After the accident the two insurance carriers and their insureds stipulated that "for the best interest of all parties" claims and suits by the passengers would be settled irrespective of liability. Pursuant thereto some seventy-three claims and suits were settled, aggregating $73,650.46, one of which was above policy limits.

Each bus company and its insurance carrier denied liability and sought to shift the responsibility to the other. Neither insurance carrier assumed responsibility for its share of the loss, nor gave notice to the other disclaiming liability for the remainder.

In disposing of the suits and claims, the two insurance carriers paid an aggregate of $13,052.78 for attorneys' fees to three different firms, and paid medical and investigation expenses in the aggregate of

$2,049.10. The amount of attorneys' fees applicable to any particular suit or claim is not shown. The medical and investigation expenses are broken down to individual cases, but there is no showing as to how much was for medical and how much for investigation.

The rights and liabilities of the parties were determined by the Court on the insurance contracts of Pennsylvania, covering Cherokee, and American, covering Capital, without any other evidence as to liability of the parties inter se.

## Settlement of Judgment

 Upon the conclusions set out in the Court's memorandum of February 8, 1950, the judgment is settled as follows:

1. Capital, having the primary liability for damage to the passengers, will be responsible for all sums paid to passengers in settlement of suits or claims, which liability shall be in turn chargeable as follows:

2. Pennsylvania shall be liable for $10,000.00 by virtue of its limits of coverage on Capital as an additional insured, and Pennsylvania shall be entitled to recover from American all sums paid to passengers in settlements in excess of $10,000.00.

3. Cherokee will be entitled to recover from Capital the sum of $2,800.00, being the amount contributed by Cherokee to the settlement of the Tate lawsuit in excess of policy limits.

4. American will be entitled to recover from Capital the sum of $2,800.00, being the amount contributed by Capital to the settlement of the Tate lawsuit in excess of policy limits, and which American refunded to Capital.

5. American shall be liable under its policy for all sums paid to passengers in settlements, except the amount of $10,000.00 chargeable to Pennsylvania (item 2) and except $5,600.00 chargeable to Capital as in excess of policy limits. (Items 3 and 4.)

6. There is no evidence under which the Court can determine the amount of attorneys' fees, investigation fees and medical expenses which are applicable to particular cases. Neither insurance carrier has accepted its responsibility for its proportionate loss and disclaimed as to other responsibility. The stipulations provide that as to all settlements made thereafter, the insurance carriers will contribute equal amounts, and the bus companies equal amounts of any excess. Therefore, the Court is of the opinion that proper interpretation of the stipulations, and the equities of the situation, require that the expenses incident to the settlements, including the attorneys' fees, hospital and investigation expenses and court costs, be divided equally between American and Pennsylvania.

The total attorneys' fees of $13,052.78, investigation and medical expenses of $2,049.10 and court costs of $596.19, or a total of $15,698.07 (amount subject to correction) will be paid one half by American and one half by Pennsylvania, or $7,849.04 by each. Pennsylvania will recover from American any amount which Pennsylvania has already paid in excess of that sum.

## Comment on Item 6

Pennsylvania has insisted that its liability for attorneys' fees and expenses should be limited to those incident to cases up to $10,000.00.

Under the Pennsylvania policy it is obligated for (1) medical and hospital service, (2) the defense of any suit against the insured alleging injury and seeking damages therefor, (3) all costs taxed against the insured in any such suit, (4) all expenses incurred by the insurance company, and (5) all reasonable expense incurred by the insured at the insurance company's request other than loss of earnings, and "the Company agrees to pay the amounts incurred under this insuring agreement, except settlements of claims and suits, in addition to the applicable limit of liability of this policy." *Penn. Policy, Coverage "C" and Insuring Agreement II.*

The claims and suits were within the purview of the policy. The sixteen suits which were instituted were all against Cherokee, Pennsylvania's insured, as well as against Capital.

The stipulations disclose that Pennsylvania on its own account undertook an in-

vestigation immediately following the accident and actually settled with eighteen of the claimants before giving any notice to, or collaborating with Capital, or Capital's insurer. Pennsylvania at no time gave notice to its insured, or to Capital and its insured, that its liability was limited to $10,000.00. It freely consented to defend in the name of its insured, the several lawsuits brought against it jointly with Capital. Had not the settlements been made promptly, doubtless all claimants would have sued both bus companies.

In the stipulations all rights of the parties were reserved, but when the stipulations were entered into, both insurance companies were denying liability. Notwithstanding this reservation, the insurance carriers were unsure of their respective liabilities. Waiving the question of primary responsibility for the accident as between the bus companies, they agreed upon a policy of cooperation under which each would advance half the funds for all settlements thereafter made. No provision was made for the rendering of any particular legal services by either company on the lawsuits that were pending or contemplated, and the proof wholly fails to show which attorneys rendered these services, and the amount applicable to any particular case.

The Court, therefore, concludes that the expenses of effecting settlement and disposing of lawsuits was considered by the parties themselves to be for the joint benefit of all concerned, and that such was the intent of the stipulations. The Court deems an equal division of this expense to be equitable under the circumstances.

### Settlement of Findings of Fact and Conclusions of Law

The plaintiffs have offered objections to the conclusions of law and filed proposed amendments thereto. These proposals are in conflict with the Court's conclusions. The objections and proposed amendments are, therefore, disallowed.

Any portions of this memorandum in conflict with or amplifying findings of fact and conclusions of law heretofore filed will in these respects be considered amendments thereto.

There will be submitted a judgment in accord with the settlements herein made.

### Findings of Fact

1. The complaint and counterclaim present for adjustment the rights of the parties with respect to certain claims which have been paid to inductees of the United States Army, who were passengers on a bus, and injured in an accident.

2. American Fidelity & Casualty Company is an insurance company engaged, among other things, in the business of issuing policies insuring or indemnifying common carriers of passengers by motor vehicle; and at all times material in this case was the insurer or indemnitor of Capital Motor Lines.

3. Capital Motor Lines is a corporation engaged in business as a common carrier of passengers by motor vehicle.

4. Pennsylvania Casualty Company was a corporation engaged, among other things, in the business of insuring motor carriers against liability to passengers; and at all times material herein was the insurance carrier of Cherokee Motor Coach Company and insured all equipment owned and/or operated by Cherokee Motor Coach Company and the policy included an omnibus coverage. Since the filing of this suit the name of Pennsylvania Casualty Company has been changed, by charter amendment, to Manufacturers Casualty Insurance Company.

5. J. B. Levan and Florence Levan are partners doing business under the firm name and style of Cherokee Motor Coach Company, and at the time involved in this case were engaged in business as common carriers of passengers by motor vehicle.

6. Capital Motor Lines had a franchise to operate from South Pittsburg, Tennessee, to Chattanooga, Tennessee. Cherokee Motor Coach Company did not have a franchise to operate between South Pittsburg, Tennessee, and Chattanooga, Tennessee. Neither Capital Motor Lines, hereinafter referred to as Capital, nor Cherokee Motor Coach Company, hereinafter referred to as Cherokee, had a franchise to operate between Chattanooga, Tennes-

see, and Fort Oglethorpe, Georgia. But Capital had been accustomed to make this short haul without objections.

7. Just prior to the date last mentioned, Capital had orders from the Government to transport a number of selectees from South Pittsburg, Tennessee, to Fort Oglethorpe, Georgia. On the designated date, November 16, 1943, Capital had no available bus. Through a duly authorized representative Capital entered into an agreement with the defendants to obtain, and did obtain, a bus and driver from Cherokee, for which Cherokee was to receive compensation. The compensation to be paid was based on the amount of the ticket sale or twenty-five cents a mile, whichever was greater, this being the charge for similar services as recognized by bus operators.

The arrangement as made for the use of Cherokee's bus was not in writing and did not specify who would pay the cost of, or insure, the operations, or what were otherwise the terms on which the bus was to be used. The amount of compensation was not agreed upon or mentioned, but was implied and understood by both parties to be in accordance with a general, informal arrangement, established by the customary compensation paid in other like situations. Both Cherokee and Capital were accustomed to obtain from one or the other a bus in like manner when necessary. On such previous occasions no special arrangements for insurance coverage were made.

8. Cherokee's driver was instructed by its dispatcher to report to Capital's representative, which he did, and was instructed by said representative to report to a driver of Capital, and to use the said bus (which was done) for the transportation of some of Capital's passengers (the overload from Capital's regular-run bus) on the outbound trip, and on his return to transport selectees from South Pittsburg. The driver so obtained from Cherokee, upon reaching South Pittsburg, reported to a driver of Capital, received from him further instructions as to picking up such selectees, and was given a regular Capital ticket indicating the number of persons to be transported and evidencing their right to passage. Said driver was then instructed by Cap-

ital's regular driver that a part of his duties was to pick up more selectees at Jasper, Tennessee. In accord with these instructions the selectees at South Pittsburg were placed on board the bus which Capital had obtained from Cherokee, by the driver which Capital likewise obtained from Cherokee, and the bus proceeded to Jasper, where, as previously instructed by Capital, the other selectees were placed on board the bus. The accident happened soon thereafter, before the bus reached Chattanooga.

9. The claims of all persons injured in the accident have been paid by the defendants, or by them and the plaintiffs, jointly, and no question is made as to the amounts or validity of the claims. No questions of negligence or as to the cause of the accident were raised. It was stipulated that all questions of primary insurance, excess insurance, and the rights of the parties, should remain open for settlement, and no party should be prejudiced by the payment of any claims.

10. The insurance premiums on policies of both carriers were based on gross revenue.

11. The amounts paid by the respective parties were as follows:

American Fidelity & Casualty Co.,
 on claims and expenses $27,405.49
 on attorneys' fees 4,398.86
Capital Motor Lines, on claims 2,800.00
Pennsylvania Casualty Co.
 on claims and expenses 46,244.97
 fees paid and agreed to be paid 8,653.92
Cherokee Motor Coach Co.,
 on claims 2,800.00

12. The Pennsylvania policy, insuring Cherokee, contains the following provision:

"III Definition of 'Insured'.

"The unqualified word 'insured' wherever used in coverages A and B and in other parts of this policy, when applicable to such coverages, includes the named insured, and, except where specifically stated to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use

of the automobile is with the permission of the named insured * * *".

13. The American policy, insuring Capital, contains the following provisions:

"1. In consideration of a premium paid by the Assured after being computed at a rate of $3.46 per one hundred dollars of gross receipts, it is hereby understood and agreed that the protection afforded by the policy to which this endorsement is attached is extended to cover all equipment owned and hired by the named Assured for the purposes set forth in Statement VIII, when such owned and hired equipment is being operated in the interest of the named Assured. * * *

* * * * * *

"4. It is further understood and agreed, subject to the conditions of the previous paragraph, that should any other like, valid and collectible insurance issued in the name of the owner or lessor or in favor of the named Assured herein, exist, this policy becomes excess over and above such valid and collectible insurance."

## Conclusions of Law

1. For the purposes of the trip in question the bus involved was under the exclusive direction and control of Capital, and was, in effect, its bus.

2. The driver obtained by Capital from Cherokee became and was Capital's servant, agent and employee for all purposes of the trip in question.

3. Cherokee, with respect to the matters and things involved herein, was not an independent contractor.

4. Cherokee was not and is not chargeable in any way with liability or responsibility in connection with the accident.

5. Capital was using the bus on this occasion with the permission of Cherokee, and is an additional insured under the Pennsylvania policy to the limits of said policy, and American's policy covers only for excess insurance above such limits.

6. The limit of liability under the original Pennsylvania policy for multiple injuries was $10,000.00. The endorsement attached to this policy increasing the limit for multiple injuries to $50,000.00 dated July 3, 1943, is not effective as to the liability here involved because the injuries did not result from the use of a vehicle "under certificate of public convenience and necessity or permit issued to the insured by the Interstate Commerce Commission, or otherwise under the Interstate Commerce Act", as provided in said endorsement.

The limit of American's policy for such injuries was $300,000.00.

7. American is liable for the amount of all settlements above $10,000.00, the limit of Pennsylvania's policy.

8. The defendant, Pennsylvania, having paid out on said settlements more than the amount of its liability obligations, will recover of plaintiffs such amount as will reimburse it for all amounts paid by it in excess of its policy limits. The cost of all settlements in excess of Pennsylvania limits will be chargeable to American, subject to its policy limits. Each insurance carrier will be responsible for all attorneys' fees, court costs, or other proper charges incident to the handling of claims or suits properly allocable to it.