DECISION
Plaintiffs timely appealed Defendant's Notices of Deficiency Assessment (assessments) for 2004, 2005, and 2006.[1] The assessments added wages earned by Plaintiff Thomas Palandech (Thomas) to Plaintiffs' jointly filed Oregon tax returns for the years at issue.[2] Those wages were earned by Thomas in his capacity as a commissioned officer in the Public Health Service (PHS), which is an active duty military service position covered by the Servicemembers Civil Relief Act (SCRA) of 2003. The parties agree, and the court concurs, Thomas is covered by the act. However, the parties disagree as to the implications of such coverage.
Trial was held in the courtroom of the Oregon Tax Court in Salem, Oregon. Plaintiffs were represented by Ted Sumner, Attorney at Law. Defendant was represented by Ron Graham, an employee of the Oregon Department of Revenue.
 I. STATEMENT OF FACTS
Thomas was born and raised in California. Mrs. Palandech (Gayle) was born and raised in the state of Washington. Thomas obtained his Doctor of Dental Surgery degree from Loyola *Page 2 
University in Illinois in 1979. Upon graduation, Thomas obtained an Illinois dental license. One year later, in 1980, he sold his condominium in Illinois and moved to Oregon. After moving to Oregon, Thomas bought a home in Salem, Oregon, obtained an Oregon driver license, an Oregon dental license, and attempted to establish a dental practice in this state. According to his testimony, Thomas took the Oregon Board of Dentistry test in 1980 because he intended to practice in Oregon. Thomas worked in various dental clinics in Portland and Salem, Oregon, between 1980 and 1984.
Both Thomas and Gayle work in the dental business. Gayle obtained her Oregon dental hygienist license in 1974. (Def's Ex H at 4.) The following year, 1975, Gayle obtained an Oregon driver license. Thomas and Gayle met at work in Oregon and were married in 1987 in Longview, Washington, where Gayle was born and raised. The couple's marriage certificate indicates that "Thomas R. Palandech [is] of the County of MARION State of OREGON." (Def's Ex H at 1.)
Thomas enrolled in the PHS as a senior assistant dental surgeon in 1984.[3] Service in the PHS is a military position and Thomas was a commissioned officer on active duty. As such, he was covered by the SCRA. Thomas was living in Salem, Oregon, when he enrolled in the PHS in 1984. He served as a dental surgeon at the Chemawa Clinic in Salem, Oregon, until 1989. At that point, Thomas had lived and worked in Oregon for roughly nine years.
Thomas served the PHS in Salem until he was reassigned to the state of Washington in 1989. The couple moved to Washington, where they registered to vote, obtained Washington driver licenses, and registered their automobiles. Thomas testified that his military housing allowance was based on an Oregon "residency," but that he used a Washington "domicile" for state income tax withholding. The court understands that those were elections made by Thomas. *Page 3 
(Def's Exs I at 5, 6 (showing an Oregon zip code for Thomas's "Housing," and "WA" for his state income tax withholding).)[4]
Plaintiffs did not purchase a home while living in Washington, but instead rented a home in Ocean Shores, near the location of Thomas's PHS service. Plaintiffs apparently sold their Oregon home after moving to Washington.
Two years later, in 1991, Thomas was transferred to New Mexico. Plaintiffs did not purchase a home while they were living in New Mexico. Plaintiffs purchased an unimproved lot in the hills of West Salem, Oregon, in June of 1992, while living in New Mexico. (Def s Ex F at 10.) Both Thomas and Gayle testified that the purchase of the lot was made "as an investment," although they also discussed the possibility building a home on that lot. Plaintiffs sold that lot approximately 11 years later in June 2003, after moving back to Oregon. (Def s Ex F at 11.)
Meanwhile, in 1993, Thomas was transferred from New Mexico to Arizona, where the couple lived with their two children for five years. While in Arizona, Plaintiffs purchased a home there, enrolled their children in school, opened bank accounts, established telephone and other utilities services, etc. Thomas testified that Plaintiffs did not have any Washington bank accounts after moving to Arizona, although they had previously banked in Washington.
In 1998, Thomas applied for a billet in the state of Washington, but was not selected. A similar position opened in Oregon. Thomas applied for that position and was accepted. The family moved back to Salem, Oregon, in 1998. Plaintiffs sold their home in Arizona and bought a five bedroom, three bath home in Salem, Oregon, in July 1998. Thomas continued to work for the PHS in Salem until his retirement in 2006 (eight years). Thomas kept his Washington driver license and voter registration until he retired from the PHS in 2006.
Plaintiffs have two daughters: Margaret, born in Salem, Oregon, in 1988, and Meredith, born in Salem, Oregon, in 1990. Plaintiffs were living in Washington at the time of Meredith's *Page 4 
birth, but the child was born in Oregon. Thomas testified that Plaintiffs chose to have Meredith delivered in Oregon because Gayle had an established relationship with an obstetrics/ gynecologist in Oregon and preferred to continue with that physician, in part because there had been complications with her first pregnancy.
Thomas's official active-duty orders, effective October 9, 1984, state in relevant part as follows: "HOME OF RECORD: SALEM OR." (Def s Ex J at 1.) For purposes of his military service, Thomas testified that he reported Washington as his state of "domicile," but had his PHS housing allowance payments calculated based on an Oregon "residency." In 2002, Thomas and Gail began doing some dental work in the same clinic. In 2003, Plaintiffs jointly registered a 1982 van in Oregon and, in 2004 or 2005, they registered a Toyota automobile in Oregon. Shortly after his retirement, Thomas obtained an Oregon driver license and registered to vote in Oregon.
As for family connections, Thomas testified that, at the time of the trial, his mother was living in Arizona. When the couple moved back to Oregon in 1998, she lived in Sacramento, California. In 2002, his mother had moved to Bend, Oregon. Thomas further testified that he has a brother living in the Milwaukie, Oregon. Gayle's mother was living in Longview, Washington, in 1998, when Plaintiffs returned to Oregon. Gayle also had a brother living in Longview and a sister in Seattle, Washington.
 II. ANALYSIS
This is a "straightforward" residency case, notwithstanding Plaintiffs' contentions to the contrary. Plaintiffs insist that special protections afforded certain qualifying military personnel under federal law change the complexion of this appeal. *Page 5 
Oregon imposes a state income tax on every resident of this state and every part-year and full-year nonresident with Oregon source income. ORS 316.037.[5] Defendant taxed Thomas's PHS income based on the belief that Thomas was an Oregon resident for the years at issue. Plaintiffs insist Thomas established a Washington domicile when he was transferred there in 1989, and that federal law precludes Oregon from taxing his PHS income.
A. The Federal Law
Plaintiffs argue that the SCRA "provides extensive protections to service members such as Mr. Palandech." (Ptfs' Post-Trial Brief at 3.) Plaintiffs cite the following provisions of the SCRA:
 "(a) RESIDENCE OR DOMICILE. — A servicemember shall neither lose nor acquire a residence or domicile for purposes of taxation with respect to the person, personal property, or income of the servicemember by reason of being absent or present in any tax jurisdiction of the United States solely in compliance with military orders.
 "(b) MILITARY SERVICE COMPENSATION. — Compensation of a servicemember for military service shall not be deemed to be income for services performed or from sources within a tax jurisdiction of the United States if the servicemember is not a resident or domiciliary of the jurisdiction in which the servicemember is serving in compliance with military orders."
50 USC 571 (2003).[6]
The SCRA was originally enacted in October 1940 as the Soldiers and Sailors Civil Relief Act (SSCRA), and subsequently amended a number of times, including changes in 2003 by Public Law 108-189 (108 P.L. 189), section 1, 117 Stat 2865. It was again amended in November 2009 by Pub.L. 111-97, section 2 (a),123 Stat 3007.[7] The effective date of the *Page 6 
November 2009 amendments is November 11, 2009. Thus, the 2003 amendments apply to this case, which concerns tax years 2004 through 2006.
The Act explains its purpose as follows:
 "(1) to provide for, strengthen, and expedite the national defense through protection extended by this Act to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation; and
 "(2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during a military service."
50 USC § 502 (2003).[8]
In Jenkins v. DOR, WL 468070 *3 (Aug. 24, 1994), this court observed:
 "The Soldier' and Sailors' Civil Relief Act of 1940 (S SCRA), 50 USCA §§ 501-591 (1990), provides certain protections to those engaged in military service for the United States. The rationale behind the act is that military personnel should be able to devote energy to the protection of their country free of civil proceedings and transactions which might otherwise prejudice their civil rights. 50 USC § 510. The Oregon Supreme Court, in Schroeder v. Toedtmeier, 184 Or 561, 200 P2d 606 (1948), considered the application of the S SCRA to the sale of a parcel of timberland by a soldier. The sale did not include the merchantable timber located on the property if the seller removed it by a certain date. Although the seller was unable to remove the timber because of his military service in World War II, the court held that the S SCRA has no provision for an extension in this kind of case. 184 Or at 567. The court stated that the S SCRA `was designed to suspend enforcement of civil liabilities in certain cases. * * * [I]t did not affect property rights as such.'" Id.
Under the Act, a servicemember will neither gain nor lose a domicile for purposes of taxation simply by being in a particular jurisdiction solely due to military orders. 501 USC § 571(a). If a servicemember is a resident or domiciliaryof another jurisdiction, compensation for military service will not be considered to be from sources within the jurisdiction the servicemember is located due to military orders. 501 USC § 571(b). *Page 7 
The pertinent language of the SCRA provides simply that "[a] servicemember shall neither lose nor acquire a residence or domicile for purposes of taxation * * * by reason of being absentor present in any tax jurisdiction of the United States solely in compliance with military orders," and that military service compensation "shall not be deemed to be income for services performed * * * within a tax jurisdiction * * * if theservicemember is not a resident or domiciliary of the jurisdiction in which the servicemember is serving in compliance with military orders." 50 USC 571(a) and (b) (emphasis added). Thus, the act does nothing to change the right of a taxing jurisdiction to determine the residency or domicile of a military servicemember. It simply precludes a rush to judgment based on mere presence. The question is where the servicemember is domiciled.
Federal law presumes that military personnel retain the domicile they had at the time they entered military service. In reKarsten, 22 Kan App 2d 882, 882, 924 P2d 1272 (1996). However, it is important to note that "[a] serviceperson may not be relieved from responsibility for a state tax on the basis of a bare assertion of an address of record with the military. There is no evidence that Congress intended to go so far. Rather than confer immunity from tax, the federal legislation was designed to protect servicepeople from multiple taxes." Carr v. Dept. of Rev., TC-MD No 040979A, WL 3047252 at *2 (Nov 4, 2005).
Plaintiffs argue that the "SCRA provides significant protections to military members." (Ptfs' Post-Trial Brief at 3.) Plaintiff insists that "Oregon has treated this as a normal residency case," and, in doing so, has overlooked the "extensive protections" afforded servicemembers under the SCRA. (Id.) Plaintiffs insist that the "SCRA was created with the express purpose of strengthening the protections provided by the original act [and that] history is important to understand when interpreting case law for the old act." (Id. at 4.)
Plaintiffs note that in Le Maistre v. Leffers,333 U.S. 1, 6 (1948), the Supreme Court held that the predecessor to the SCRA, the Soldiers and Sailors Civil Relief Act (SSCRA), "should be *Page 8 
liberally interpreted and ambiguities resolved `with an eye friendly to those who dropped their affairs to answer the country's call.'" (Ptfs' Post Trial Brief at 4.) The court agrees, but finds no ambiguity here.
Plaintiffs next argue that a subsequent Supreme Court decision,Dameron v. Brodhead, 345 US 322, 326-27 (1953), "rejected an argument that would allow a rebuttable presumption of non-taxability [sic], [9] because that could result in service members being forced to litigate their domicile in any state where they are stationed, nullifying the important protections of the statute." (Ptfs' Post Trial Brief at 4.) Dameron involved a servicemember's challenge to Colorado's attempt to tax, under that state's law, the personal property owned and used by the servicemember in Colordo. In his successful challenge to the tax, Dameron argued that Colorado was precluded from imposing the tax under section 514 of the SSCRA, as amended and in place in 1948, the year at issue in that case, because he was a resident and domiciliary of the state of Louisiana, temporarily stationed in Colorado under military orders. The relevant provision of the act, added as an amendment in 1944, provided: "personal property shall not be deemed to be located or present in or to have a situs for taxation in such State, Territory, possession, or political subdivision, or district." Dameron, 345 US at 324.[10] The US Supreme Court overturned the Colorado Supreme Court, rejecting the state's argument that the act either did not apply or was unconstitutional. Id.
The language from US Supreme Court's opinion in that case, quoted by Plaintiffs in their Post-Trial Brief, addresses the first of those two arguments (although they were taken in reverse order by the court). Id. The Dameron court addressed two of the state's arguments concerning *Page 9 
the applicability of the statute: that the legislative history revealed an intent only to prevent multiple state taxation, and that the word "`deemed' as used [in the statute] implies a rebuttable presumption so as to permit taxation by the state of temporary presence * * *." Id. at 325-26. The court swiftly and soundly rejected both arguments.
The Dameron court made two significant statements that undercut Plaintiffs' position. One was that "Congress appears to have chosen the broader technique of the statute carefully, freeing servicemen from both income and property taxes imposed by any state by virtue of their presence there as a result of military orders. It saved the sole right of taxation to the state oforiginal residence * * *." Id. at 326 (emphasis added). The other is that the "statute merely states that the taxabledomicile of servicemen shall not be changed by militaryassignments." Id. at 325 (emphasis added). Neither of those statements has any impact on a state's right, indeed responsibility, to determine a servicemember's residency. See e. g, ORS 305.265(2) (providing in part that "[a]s soon as practicable after a report or return is filed, the department shall examine or audit it, if required by law or the department deems such examination or audit practicable." (Emphasis added.))
Plaintiffs next argue that, in refusing to grant summary judgment, the federal District Court in United States v. Minnesota(US v. Minn.), 97 F Supp 973 (D Minn 2000) "found that the marital presumption was preempted by the SSCRA." (Ptfs' Post Trial Brief at 5.) The primary focus of that case was on a regulation adopted by the Minnesota Department of Revenue pursuant to which "the domicile of one spouse [was] presumably the same as that of the other absent evidence to the contrary;" the so-called marital presumption.[11] US v. Minn., 97 F Supp at 975. The Court concluded that it was improper for a state to use the domicile of a *Page 10 
serviceperson's spouse as a presumption as to the serviceperson's domicile. Id. at 982. That case has no relevance here, because Oregon has no such presumption. The court in US v.Minn. simply declared that "[t]he marital presumption, used by itself, has absolutely nothing to do with any explicit actions of a serviceperson which could be interpreted as indicating an intent to remain in a given state following his posting." Id. at 982. After quoting the pertinent language of the SSCRA, section 514, the court declared that "[a] plain reading of the text of the SSCRA thus leads to the conclusion that a state may tax a serviceperson aslong as other factors exist, in addition to physical presence in the state, which leads to the conclusion that a serviceperson has affirmatively chosen the state of posting as his home."Id. at 984 (emphasis added). Plaintiffs acknowledge in their Post-Trial Brief that the court allowed "the state to examine other factors to determine whether there was a domicile change." (Ptfs' Post Trial Brief at 5.)
Thus, all of those cases can either be differentiated on the facts or disregarded as irrelevant in that they do not support the proposition for which they are asserted by Plaintiffs.
B. Oregon's Residency Laws
As indicated above, Oregon imposes a state income tax on Oregon residents and nonresidents with Oregon-source income. ORS 316.037. Oregon defines a "resident" as "[a]n individual who is domiciled in this state * * *." ORS 316.027(1)(a)(A). Thus, residency is statutorily equated with domicile.
Domicile is a common-law concept composed of two components: "(1) a fixed habitation or abode in a particular place" and (2) "an intention to remain there permanently or indefinitely." delaRosa v. Dept. of Rev. (dela Rosa),313 Or 284, 289, 832 P2d 1228 (1992) (internal quotation marks omitted). Oregon Administrative Rule (OAR) 150-316.027(1)(1)(a) defines "domicile" as "the place an individual considers to be the individual's true, fixed, *Page 11 
permanent home" and as "the place a person intends to return to after an absence."[12] While an individual can have more than one residence, he "can have but one domicile." dela Rosa,313 Or at 289 (internal quotation marks omitted); see alsoZimmerman v. Zimmerman, 175 Or 585, 591, 155 P2d 293 (1945); OAR 150-316.027(1)(1)(a).
C. Thomas's Residency Status
1. Did Thomas Establish an Oregon Residency?
Viewing the facts as a whole, the court finds that Thomas became a resident of Oregon in 1980, when he moved here from Illinois. According to the facts in evidence, it is clear that Thomas had a "fixed habitation or abode" in the Oregon and "an intention to remain [here] permanently or indefinitely." dela Rosa,313 Or at 289.
Thomas was born and raised in California. In 1979, Thomas graduated from Loyola University in Illinois with a doctorate degree in dental surgery. Thomas apparently owned a condominium in Illinois at that time. In 1980, he sold his Illinois condominium and moved Oregon. Upon moving to this state, Thomas purchased a home in Oregon, and obtained an Oregon driver license. Importantly, Thomas successfully took the Oregon Board of Dentistry test and obtained an Oregon dental license, after which he began working as a dentist in Oregon. Thomas worked at various dental clinics in Portland and Salem between 1980 and 1984. There was no explanation for Thomas's move to this state other that he liked the Northwest. He was not originally from Oregon, so the move here, coupled with the substantial ties he developed, show that Thomas intended to become an Oregon resident domiciliary.
Thomas enrolled in the PHS as a dental surgeon in 1984. He was living in Salem, Oregon, at the time. Thomas continued to live and work in Oregon in his PHS military position until 1989, when he was transferred to the State of Washington. *Page 12 
"The law is also clear that once domicile is established or determined to be in a particular location, it remains there until the person establishes a new domicile." Duncan v. Department ofRevenue, 1998 WL 792454 *1, TC No 4315 (Nov. 3, 1998);Doyle v. Doyle, 17 Or App 529, 532, 522 P2d 906 (1974).
To effect a change of domicile, "three elements are necessary: (1) the person must establish a residence in another place; (2) form an intent to abandon the old domicile; and (3) intend to acquire a new domicile." White v. Dept. ofRev. (White), 14 OTR 319, 321 (1998). Given the inherent difficulties in ascertaining intent, "triers of the fact of domicile rely heavily upon the overt acts of the individual as true indicators of his state of mind. Nevertheless, the whole aim of the inquiry is to discern the true intent." Hudspeth v. Dept. ofRev., 4 OTR 296, 298-99 (1971). Thus, "determination of an individual's domicile is based on intent supported by facts and circumstances rather than merely the statements of the individual."Butler v. Dept. of Rev., TC-MD No 050801 D, WL 2041284 at * 4 (July 18, 2006). Factors contributing to a determination of domicile "include family, business activities[,] and social connections." OAR 150-316.027(1)(1)(a).
2. Did Thomas Abandon His Oregon Domicile?
The next question is if and when Thomas ever abandoned his Oregon domicile. Plaintiffs insist that Thomas "established Washington as his domicile" in 1989, after he was transferred to that state. (Ptf's Post Trial Brief at 1.) Plaintiffs note that Thomas obtained his Washington driver license and voter registration shortly after moving to that state and that he "designated" Washington as his domicile with the PHS. Plaintiffs argue that Thomas "maintained his Washington driver license, voted in Washington and maintained Washington as his designated domicile with PHS" throughout his PHS career. (Id. at 2.) However, a person's "designation," whether with the military or otherwise, is not conclusive. *Page 13 
Plaintiffs' further argue that, once Thomas acquired his Washington domicile, he gets to keep it forever because of some special protections afforded by the federal statute. The court disagrees. As stated above, for purposes of state taxation, all the federal statute does is protect a member of the military from automatically becoming a resident and domiciliary of the state to which he is transferred simply because he or she is present in that state.
a. Residence
Applying the three-part test laid out in White, Thomas clearly established a "residence" in several other states after leaving Oregon, the first of which was Washington, where he moved to 1989. By law a "residence * * * is simply an abode," which is defined as "any physical building, structure, or vehicle in which the taxpayer lives and sleeps." Bleasdell v. Dept. of Rev.,18 OTR 354, 361 (2004) (citation omitted); see alsoRamsey v. Dept. of Rev., 7 OTR 478, 481 (1978) ("[Abode] signifies a building or shelter which is the dwelling place of a person."). After leaving Oregon in 1989, Plaintiffs either rented or purchased homes in Washington, New Mexico, and Arizona, before returning to Oregon in 1998.
b. Intent to abandon Oregon
The next question is whether Thomas abandoned his Oregon domicile. To effect a change in domicile, Thomas must have manifested an intent to abandon his Oregon domicile. The second prong of theWhite test is based on an individual's intent, which is "heavily steeped in the subjective view of the individual[.]"Ott v. Dept. of Rev. (Ott), 16 OTR 102, 111 (2002). That creates the problem of determining the subjective intent of the individual in the past and courts will rely on objective evidence to determine that intent. Id. (looking at the taxpayer's conduct);Sage v. Dept. of Rev,. TC-MD No 060574C, WL 1660764 at *7 (June 5, 2007).
The evidence indicates that Thomas did, in fact, intend to abandon his Oregon domicile when moving to Washington. After Thomas was transferred to Washington to continue his *Page 14 
military service with the PHS, Plaintiffs sold their Oregon home and rented a home in Washington. Plaintiffs registered to vote in Washington, obtained Washington driver licenses, and registered their automobiles in that state.
c. Intent to acquire a new domicile
The third prong of the White test — that the person intended to acquire a new domicile — is perhaps the most important of the three prongs. As the Oregon Supreme Court stated in Reed'sWill.:
 "To lose a domicile when once acquired, there must be an intention to do so. A mere change of the place of abode, however long continued, is not sufficient, unless the proper animus or intention is present. This intention, it is true, may be inferred from circumstances, and the residence may be of such a character and accompanied by such indices of a permanent home that the law will apply to the facts a result contrary to the actual intention of the party. Thus one cannot make a permanent fixed commercial residence with all the surroundings of a permanent home in one place and a domicile in another by a mere mental act."
Reed's Will., 48 Or 500, 510, 87 Pac 763 (1906).
The facts, although somewhat equivocal, suggest that Thomas intended to acquire a new domicile in Washington, and the court so finds. He and Gayle moved to Washington, sold their Oregon home, rented a home in Washington, and obtained various Washington licenses. Thomas worked in that state, although he was there under military orders. It appears that Gayle continued to work in Oregon, and the couple had two children born in Salem, Oregon, which is a considerable distance from their rented home in Washington. Moreover, Thomas used Oregon for the calculation of his PHS housing allowance payments during the entire time of his absence from this state, beginning with his move to Washington. However, the question is, in the end, somewhat moot, for the reasons set forth below.
The court's determination that Thomas abandoned his Oregon domicile and acquired a new domicile in Washington does not end the inquiry, however. The reason is that, two years after moving to Washington, Thomas and his family (Gayle and their two daughters) moved to *Page 15 
New Mexico in 1991, and then moved again to Arizona in 1993, and five years later, moved back to Oregon in 1998, where they remained through the time of trial in 2010 (which includes the tax years at issue: 2004, 2005, and 2006).
3. Did Thomas Change His Domicile Back to Oregon?
Applying the same three-part test the court addressed above in determining whether Thomas abandoned his Oregon domicile, the court finds that Thomas did change his domicile back to Oregon in 1998. Several key factors lead to that conclusion. After Plaintiffs moved from Washington to New Mexico in 1991, they purchased an unimproved lot in Salem, Oregon. The lot was buildable, and Plaintiffs testified that they had, at some point, discussed building a home there. If, as Plaintiffs contend, they intended to return to Washington, it seems more likely and reasonable that they would have purchased a lot in Washington rather than Oregon. Also, when Plaintiffs moved to Arizona in 1993, they purchased a home in that state, opened bank accounts there, and, importantly, they closed their Washington bank account(s). Those and other facts suggest that Plaintiffs intended to make Arizona their domicile. However, when they left Arizona five years later, they sold their home there and purchased a home in Salem, Oregon. Thomas still had his Oregon dental license, and, beginning in 2002, he began practicing dentistry on a part-time basis at a Salem dental office, even though he was still working for the PHS, presumably on a full-time basis. Moreover, Thomas's mother moved to Oregon from another state that same year, and Thomas had a brother living in Oregon less than an hour from his home in Salem. Plaintiffs had bank accounts in Oregon and jointly registered vehicles in Oregon in 2003 and 2004. Thomas was still receiving his military housing allowance based on his PHS designation of his "residence" being Oregon, a designation he elected when he moved from Oregon to the state of Washington in 1989. Thomas continued to claim Washington residency (or domicile) with the PHS for purposes of his state tax withholding, which had the *Page 16 
effect of exempting that income from state taxation because Washington does not have a state income tax, whereas Oregon does.
It is true that Thomas retained his Washington driver license and voter registration until he retired from the PHS in 2006. Those acts, however, appear to have been designed to apply the veneer of Washington residency over the base of an Oregon domicile.
It must be remembered that the framework for the three-part test for a change of domicile laid out in White is designed to help answer the question of where a person is domiciled. As stated above, domicile is "the place an individual considers to be the individual's true, fixed, permanent home." OAR 150-316.027(1). The two components are a fixed habitation or abode and an intention to remain there. In this case, the "there" became Oregon in 1998. "Factors that contribute to determining domicile include family, business activities and social connections." OAR 150-316.027(1)(1). While Thomas had many Oregon ties, he had virtually no Washington ties and, during all of the time he was living in this state after returning in 1998, he made no effort to establish any ties in Washington.
 III. CONCLUSION
The court concludes that Thomas was an Oregon resident, domiciled in this state, for tax years 2004, 2005, 2006, and that his PHS income for those years is subject to Oregon state income taxation. Plaintiffs' contention that Thomas is protected by the SCRA because he claimed Washington as his state of domicile is not well taken. The SCRA only serves to protect a servicemember from being deemed to have lost or acquired a residence or domicile simply because he is in a particular taxing jurisdiction solely in compliance with military orders. The act specifically allows taxation of military personnel if the individual is a resident or domiciliary of the jurisdiction in which the servicemember is serving. Now, therefore, *Page 17 
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied and Defendant's notice of deficiency assessments for 2004, 2005, and 2006, issued October 6, 2009, are upheld.
Dated this ___ day of March 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Dan Robinsonon March 23, 2011. The Court filed and entered this documenton March 23, 2011.
[1] Plaintiffs appealed on the final day of their statutory appeal rights, based on the January 4, 2010, postmark date of their appeal, which is exactly 90 days from the date of Defendant's assessments issued October 6, 2009. See generally
ORS 305.280(2) (2007).
[2] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and reference to two individuals with the same last name, Palandech. To avoid confusion, the court will use the first name of the individual being referenced.
[3] He may have briefly enrolled in the PHS in 1979 or 1980, but that is not a fact critical to the outcome of the court's determination herein.
[4] Washington does not have a state income tax and so the amount withheld from Thomas's PHS wages for state income tax purposes was $0.
[5] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) are to 2003.
[6] Amendments made in 2004 by Public Law 108-454, known as the Veterans Benefits Improvement Act of 2004, modified chapter 38 of the United States Code (USC) to address housing, education, and other benefits, and are not relevant to the case at bar. The court therefore cites to 50 USC sections 571 and 595, enacted under Public Law 108-189.
[7] "Applicability of November 11, 2009, amendments. Act Nov. 11, 2009, P.L. 111-97, § 3(b), 123 Stat. 3008, provides: "Subsections (a)(2) and (c) of section 511 of such Act (50 USC. App 571), as added by subsection (a) of this section, and the amendments made to such section 511 by subsection (a)(4) of this section [amending subsec. (d) of this section], shall apply with respect to any return of state or local income tax filed for any taxable year beginning with the taxable year that includes the date of the enactment of this Act." Pub.L. 111-97, section 2 (a),123 Stat 3007.
[8] Unless noted otherwise, all references to the SCRA are to 2003.
[9] The court presumes Plaintiffs meant a rebuttable presumption of "taxability," not "non-taxability." The court in that case stated: "we reject the argument that the word `deemed' as used [in the federal statute] implies a rebuttable presumption so as to permit taxation by the state of temporary presence in some cases." Dameron, 345 US at 326-327.
[10] The Act continues to limit the taxation of personal property owned by servicemembers, with language nearly identical to that in the 1944 amendment involved in Dameron.50 USC § 571(c).
[11] The court observed that the "`marital presumption' is quite straightforward. Subpart 2 states `the presumption is that the place where a person's family is domiciled is that person's domicile. The domicile of a spouse shall be the same as the other spouse unless there is affirmative evidence to the contrary or unless the husband and wife are legally separated or the marriage has been dissolved.' Minn. Rule 8001.0300, subp. 2." US v. Minn., 97 F Supp 982
[12] Unless otherwise noted, all references to the Oregon Administrative Rules (OAR) are to 2004 . *Page 1